517 So.2d 541 (1987)
Richard LUTES
v.
STATE of Mississippi.
No. 56268.
Supreme Court of Mississippi.
November 25, 1987.
Rehearing Denied January 13, 1988.
*542 Joe Clay Hamilton, Earl P. Jordan, Jr., Meridian, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
DAN M. LEE, Presiding Justice, for the Court:
Richard Lutes appeals his conviction of capital murder rendered by a jury in Lauderdale County Circuit Court for the shooting death of Meridian businessman, Larry Boggs Tiffee. After a bifurcated sentencing trial, the jury declined to invoke the death penalty and returned a verdict of life in prison. He appeals assigning three errors in the trial below:
1. The Court erred in overruling Defendant's motion for a change of venue and in not allowing individual Voir Dire and in not allowing a jury questionnaire to be submitted by defendant.
2. The trial court erred in denying Appellant's Motion to Suppress Appellant's statement, and Supplemental Motion to Suppress, incorporating all tangible and intangible evidence seized from the Appellant's home in Gross Tete, Louisiana, and his wife, Irmgard Lutes, or from the Appellant, Richard Lutes, including any statement, statements, or confessions of the Appellant.
3. The verdict of the jury was against the overwhelming weight of the credible evidence, and there was insufficient evidence for the jury to place a finding of guilt or to determine the Defendant was guilty beyond a reasonable doubt.
Larry Boggs Tiffee was found shot to death in his Meridian, Mississippi home on the afternoon of March 26, 1983. There were seven external wounds, but death was caused by bullets which entered Tiffee's head and chest.
Robbery appeared to be the motive. Tiffee's wallet was missing and several guns had been taken from his gun cabinet. His body was bare of jewelry which an employee said he wore. However, as the investigation continued, law enforcement authorities came to believe that more than simple robbery was involved. A paper trail of credit purchases in Louisiana and Texas made by someone using credit cards owned by Tiffee and Tiffee's company, Southwest *543 Development Company, led authorities to Richard Lutes.
Mississippi and Lauderdale County law enforcement officials learned of the credit card purchases through Tiffee's bookkeeper, and they asked Texas and Louisiana authorities for assistance.
Louisiana authorities identified Lutes with the help of a composite drawing and a Louisiana tag number registered to Lutes which was given during a credit card purchase.
Two Mississippi investigators accompanied Louisiana State Police when on July 12, 1983, a Slidell, Louisiana merchant and one of her part-time employees viewed the lineup and identified Lutes as the man who made several credit purchases posing as Tiffee on the day after Tiffee was killed.
On July 12, 1983, Louisiana authorities obtained an arrest warrant in Slidell, La., for Lutes on charges of forgery and unauthorized use of a credit card, a crime under Louisiana law. On July 13, 1983 Louisiana authorities also obtained a search warrant, seeking the cards and listed items believed to have been obtained through the use of the credit cards.
Lutes was apprehended at his home near Gross Tete, Louisiana sometime early on the morning of July 14, 1983. Louisiana State Police, aided by Mississippi authorities investigating Tiffee's murder, had executed the search warrant earlier in the evening while Lutes' son and wife, Irmgard, were home, but while Lutes was away on business. The search turned up numerous items purchased with the stolen credit cards and also items taken from the Tiffee home. Included among the items seized at Lutes' residence was a briefcase Lutes said belonged to Tiffee. Among several things found in the briefcase was a .380-caliber semi-automatic pistol later identified as the murder weapon.
Lutes gave two tape-recorded statements to officers. In the statements Lutes implicated himself, Robert "Peanut" Griffin of Meridian and a mysterious man Lutes knew as "Al" as principals in some type of scheme. A woman was also involved according to Griffin, Lutes said, but Griffin never mentioned a name.
Lutes stated that he had met with Griffin in Meridian on two separate occasions. They had talked about "doing something to somebody, whatever was necessary, [but] I didn't get no names or anything until he'd discussed thirty thousand dollars." The first meeting was several weeks before Tiffee's death. Lutes spent the day in Meridian. However, nothing happened and Griffin ended up telling Lutes to go home because the deal was off.
Griffin called Lutes back several weeks later and asked him to return to Meridian with a gun. This Lutes did on March 25, 1983. Lutes stated that Griffin introduced him to the man known as Al. He and Al rode together that afternoon in Lutes' Datsun 280-Z. He drove them by Tiffee's neighborhood to case the place. They returned that night and parked on a dirt road down a hill and behind the Tiffee residence. Lutes stated they both approached the house but only Al entered.
Al emerged from the house with a couple of shotguns, a briefcase containing some of Tiffee's personal papers and a jar of change. Al drove Tiffee's car to the highway, where he met up with Lutes and unloaded the items into Lutes' automobile.
The pair then drove on to Slidell where they began using the credit cards. From Slidell, the pair proceeded to New Orleans, then into Texas and on to Dallas for a couple of days before Lutes dropped Al at the airport in Lafayette, Louisiana.
Lutes' second statement was basically consistent with the first but with added detail. In his second statement Lutes mentioned that someone arrived in the car which Al drove away from Tiffee's residence after he and Al approached the house.
Lutes also clarified in his second statement that Griffin had told him he would be paid after the woman received several hundred thousand dollars in insurance money, but he never received more than a couple of hundred dollars expense money from Griffin.
*544 At no point during either statement did Lutes confess to the actual slaying. Lutes did state that because of flashbacks he suffered as a result of an injury suffered while in service in Vietnam that he could not be certain it was not he who actually pulled the trigger.
Griffin and later Gloria Tiffee, the victim's estranged wife, were arrested and also charged in connection with the slaying.
Griffin had been incarcerated for some time when on September 19, 1983, he gave a 13-page statement to police explaining how he offered Lutes $30,000 for a killing on credit, to be paid from an insurance policy taken out on Larry Tiffee which listed Gloria Tiffee as the beneficiary. Griffin implicated Gloria Tiffee as the procuring party in the murder-for-hire scheme.
Griffin said that Lutes originally wanted $10,500 to kill Tiffee, with one-half of it to be paid up front, but he talked Lutes into accepting $30,000 for waiting until later to get paid from an insurance policy.
At Griffin's request, when he came to Meridian on March 25, 1983, Lutes brought someone with him who he introduced as his nephew, Griffin said. Griffin did not know the man's name. Griffin's statement included his recollection of conversations with Lutes after Tiffee's death wherein Lutes admitted he killed Tiffee using a Mack-10.
Lutes called him the morning after the murder about 9:30 a.m., Griffin said, and said "Tell that lady her rooster died last night." Lutes denied this at trial.
According to Griffin's statement, Lutes expressed confidence during these conversations that he would not be caught.
He said, "Do you realize what it takes to prove murder, you've almose [sic] got to have the murder weapon to prove it." He said that he had two barrels to the gun and had changed them on the way home.
Both Griffin and Lutes testified at trial. Both testified in a manner basically consistent with their previous statements. By his own testimony, Lutes placed himself and Al at the Tiffee house on March 25, 1983, the night before Tiffee's body was found.
The only factual question presented to the jury was whether Lutes had gone to the Tiffee home and fired the fatal shots as part of a murder scheme, or whether Lutes had become an unwitting scapegoat who never intended to be a party to murder.
Mike Allen, Mississippi Crime Lab forensic scientist and ballistics expert for the state, identified a .380-caliber semi-automatic pistol found in Tiffee's briefcase as the murder weapon. Also found in the Lutes home was a barrel extension for the weapon. Allen testified that the lab testfired the weapon with and without the extension and they discovered it had no effect on the characteristics of the bullet fragments.
Allen testified that the model name of the murder weapon was RPB SM11-Al made by RPB Industries. This type of weapon was also previously manufactured by Machine Armaments Corporation (MAC) and later by a company called Cobra.
However, Lutes testified at trial that the murder weapon was not his gun, though he had a similar model, .380-caliber weapon which he called both his Cobra and his Mack-10. He testified that he did not take his Mack-10 semi-automatic pistol with him to Meridian March 25, and he normally did not carry it because it was too bulky. However, he testified that he returned home between going to New Orleans and going to Texas. At this time he put his Mack-10 into Tiffee's briefcase, which he and Al continued to carry around. He and Al went to Dallas, where Lutes left Al in a hotel room with the briefcase until he went to visit the wife of a friend. Lutes said Griffin knew Lutes had the Mack-10 because he had brought it with him on his earlier trip to Meridian and Griffin had looked at it and fired it.
Lutes at trial maintained that he was certain he was not the person who entered the residence and killed Tiffee. He testified at trial that the scheme referred to in his statements was a fake burglary and insurance fraud scheme designed to allow "the guy" to recover for items he was going to claim were stolen. Lutes was to get part of the insurance proceeds.
*545 Lutes also said at trial the $30,000 had been discussed as his fee for doing some collecting work for a Dr. Al Veach or a man by the name of Tank Gilbert. He had met Gilbert the afternoon of March 25, 1983 before the murder.
Lutes testified at trial that he did not kill Tiffee and though he and Griffin discussed the $30,000 figure, Griffin never discussed what they would do.
Griffin testified that when Lutes arrived at his house on March 25, 1983, he spelled out the deal for the murder on credit, but he also discussed some collection work for a Dr. Al Veach so the trip would not be wasted if Lutes didn't want to do the killing on credit.
Griffin was the state's star witness against Lutes, and in return for his assistance he pled guilty to two counts of conspiracy and was sentenced to two 20-year sentences, the sentences to run concurrently.
The case received a great deal of pretrial publicity in the local media and Lutes moved for a change of venue. This motion was denied following a pretrial hearing.

I.

DID THE TRIAL COURT ERR IN DENYING LUTES' MOTION FOR A CHANGE OF VENUE?
We are called upon here to once again review whether a trial court abused its discretion in failing to grant a change of venue.
This case was tried before this Court decided Johnson v. State, 476 So.2d 1195 (Miss. 1985), and Fisher v. State, 481 So.2d 203 (Miss. 1985).
This Court has reiterated and applied Johnson and Fisher in several more recent cases. See White v. State, 495 So.2d 1346 (Miss. 1986); Weeks v. State, 493 So.2d 1280 (Miss. 1986); Cabello v. State, 490 So.2d 852 (Miss. 1986); Wiley v. State, 484 So.2d 339 (Miss. 1986).
These cases have focused on the ultimate question facing this Court on appeal  did the trial court abuse its discretion in denying the motion for change of venue.
We have stated that the trial judge's decision is vested in his sound, not unfettered discretion. Fisher, 481 So.2d at 215. See White, 495 S.2d at 1349; Cabello, 490 So.2d at 854.
Ordinarily the motion should be granted "where, under the totality of the circumstances it appears reasonably likely that, in the absence of such relief, the accused's right to a fair trial may be lost." Fisher, 481 So.2d at 220. See White, 495 So.2d at 1349; Cabello, 490 So.2d at 854. This is because "the accused has a right to a change of venue when it is doubtful that an impartial jury can be obtained." Johnson, 476 So.2d at 1210.
When the accused has complied with the "proper application" requirement by making a motion supported by affidavits of two or more witnesses in conformance with Miss. Code Ann. § 99-15-35, a presumption arises that an impartial jury may not be obtained. "[T]he state then bears the burden of rebutting that presumption." Johnson, 476 So.2d at 1211. White, Cabello, supra.
This presumption is normally rebuttable and may be rebutted during voir dire. See White, 495 So.2d at 1348-49. However, this does not mean that the trial court should delay ruling on the defendant's motion until after voir dire. The defendant is entitled to a ruling on his motion when it is heard. Fisher, 481 So.2d at 223-24.
We noted in Johnson that pretrial publicity "can be so damaging and the presumption so great, that no voir dire can rebut it." 476 So.2d at 1211. And in Fisher, we stated that the trial court erred in taking at face value the assurances of the impaneled jurors that they could ignore the extensive and highly prejudicial pretrial publicity and provide a fair trial. Fisher, 481 So.2d at 222. The limited ability of our system to overcome the peer pressure attendant jury selection and our institutionalized incapacity to feret out the subtle influence of publicity are reasons these assurances are suspect under circumstances like those we faced in Fisher, 481 So.2d at 220-21.
However, this is not to say that reversal is automatic where venue remains unchanged *546 in light of extensive pretrial publicity. See White, 495 So.2d at 1349.
In both Johnson and Fisher this Court kept in mind that this Court sits as a court of review. In reviewing whether the trial court abused his discretion in denying a change of venue "we look to the completed trial, particularly including the voir dire examination of prospective jurors, to determine whether the accused received a fair trial." Winters v. State, 473 So.2d 452, 457 (Miss. 1985); Billiot v. State, 454 So.2d 445, 455 (Miss. 1984). See Fisher, 481 So.2d at 223; Johnson, 476 So.2d at 1215.
Our decision in Johnson, and to a lesser extent in Fisher, were based on this Court's decision in Eddins v. State, 110 Miss. 780, 781, 70 So. 898, 899 (1916). There the Court looked to the completed trial to determine that a change of venue was warranted. This Court stated:
If we take the record as a completed history of the trial, and consider incident thereof in its relations to the whole, we find ourselves impressed with the belief that appellant did not, and could not, have obtained a fair consideration of his case by an impartial jury to be drawn from the district of the county in which he was tried.
In Shimniok v. State, 197 Miss. 179, 192, 19 So.2d 760 (1944), it is said:
In testing the fairness or bias of the jurors, we may also look at the verdict they reached viewed in the light of the evidence on the merits as a completed trial. We have done that and direct attention to the recital of the evidence appearing hereinafter in this opinion. Under these circumstances, we cannot say the trial judge abused his discretion. He had all the witnesses on the motion and the qualifying jurors before him and was in better position than we are to be judge of their credibility.
It was in this light that we said in Johnson:
[T]aken cumulatively and conjunctively, all of the attendant facts and circumstances, as revealed at trial, demand reversal and a change of venue prior to retrial.
No doubt there was substantial pre-trial publicity. At the hearing on the motion to change venue, Lutes introduced six witnesses who were employed by various Lauderdale County media outlets. They all testified that they provided thorough news coverage of the Larry Tiffee murder investigation. Most stated coverage was especially extensive during the trial of Gloria Tiffee, the victim's widow, which preceded Lutes' trial.
The state only produced two witnesses who basically testified that they thought Lutes could receive a fair trial and that they had not heard of community sentiment of ill will towards Lutes or prejudgment of his guilt.
During voir dire all but eight of the 79 persons in the venire stated they heard about the case, and the state in oral argument even wondered where these eight persons were that they had not heard about the case.
Against this backdrop, it would seem the state was faced with "a heavy burden of showing why venue should not be changed." Fisher, 481 So.2d at 221. Given our decisions in Johnson and Fisher, the trial court no doubt should have changed the venue, and rightfully so.
The Constitution of this state, however, only requires that an accused get a fair trial, not a perfect one. See Sand v. State, 467 So.2d 907 (Miss. 1985); Bell v. State, 443 So.21d 16 (Miss. 1984); Palmer v. State, 427 So.2d 111 (Miss. 1983); Shaw v. State, 378 So.2d 631 (Miss. 1979). After careful review of the completed trial we are satisfied that the jury impaneled in this case did not compromise Richard Lutes' right to a fair trial.
The record reveals that the 14 prospective jurors who had heard about the Tiffee murder through the media and who had formed an opinion as to Lutes' guilt or innocence were questioned and excused for cause.
Of the remaining prospective jurors who indicated they had heard about the case, all indicated they could render a verdict based only on the evidence presented at trial. The veniremen were not specifically asked if they could put aside what they had heard *547 in the news, but we are satisfied that this was the import of the response to the question whether they could decide the case on the evidence presented.
Taking the completed trial in this case, unlike our decision in Johnson, "we are strengthened in our view" that Richard Lutes did receive a fair trial. Johnson, 476 So.2d at 1215.
We find that "look[ing] at the verdict [the jury] reached viewed in the light of the evidence on the merits as a completed trial" the fairness and impartiality of the jury was established in this case.
While it might appear at first blush that the trial court abused its discretion in denying the change of venue request in this highly publicized trial, a close study of the record reveals to us that no reasonable jury could have returned a different verdict. It seems senseless to assail a jury which would have reached the same result with or without the extensive publicity which accompanied this trial.
A much stronger showing of partiality or bias would have been made had the jury returned a verdict of death, but in light of the jury's decision not to return the death penalty, we cannot say, in all candor, that Lutes did not receive a fair, yet possibly imperfect trial.
We find no merit in Lutes' argument that he should have been entitled to individually voir dire the jury, Billiot v. State, 454 So.2d at 456. Likewise, we find no merit in Lutes' argument that he should have been allowed to submit a jury questionnaire.

II.

DID THE TRIAL COURT ERR IN DENYING APPELLANT'S MOTION TO SUPPRESS AND APPELLANT'S SUPPLEMENTAL MOTION TO SUPPRESS, WHEREBY APPELLANT SOUGHT TO EXCLUDE APPELLANT'S STATEMENTS AND ANY TANGIBLE OR INTANGIBLE EVIDENCE SEIZED FROM APPELLANT'S HOME?
Lutes moved to suppress the statements he gave authorities after his arrest, as well as other evidence against Lutes obtained as a result of execution of a search warrant. The trial court overruled Lutes' motion to suppress.
Lutes maintains that the search was conducted without probable cause and that authorities acted unreasonably and unnecessarily instrusively in conducting the search. He argues that both statements, taken after his arrest, were the product of "invidious trickery," without proper warning of their import, and therefore not freely and voluntarily given. In addition, Lutes maintains that he was subjected to duress and coercion because of violations of his wife's rights in his presence at his home on the night of his arrest.
Both Lutes' arrest and the search of his residence were done pursuant to warrants issued by Louisiana judicial authorities. The two arrest warrants were issued by a Slidell city judge, and the search warrant was issued by Iberville Parish Judge Jack Marionneaux on affidavit made by Louisiana state police officers.
Lutes points to nothing which would indicate that this Court, sitting in review, could find that the issuing magistrates lacked "a substantial basis for concluding" that probable cause existed. Harper v. State, 485 So.2d 1064, 1066 (Miss. 1986); Breckenridge v. State, 472 So.2d 373 (Miss. 1985).
Officer Kenneth Trull, the affiant for the warrants, testified at the suppression hearing to numerous facts and underlying circumstances which would have supported probable cause. As the state points out, Trull and Louisiana authorities had a composite drawing of a man using Tiffee's credit cards obtained from Texas authorities. Texas authorities also provided the number of a truck license tag registered to Lutes which was listed on a Texas authorities also provided the number of a truck license tag registered to Lutes which was listed on a credit card purchase receipt in Fairfield, Texas. Louisiana authorities observed in Lutes' yard the truck whose tag number was used in the purchase. Officer *548 Trull, who knew Lutes, identified Lutes from the Texas composite, and prepared a photographic lineup from which a Slidell merchant identified Lutes as the man using Tiffee's American Express credit card to make over $600 worth of purchases the day after Tiffee's murder.
The above mentioned underlying facts and circumstances are outlined in the affidavit made by Trull and Sgt. Gary Morford, both of the Louisiana State Police Criminal Investigation division, to obtain the search warrant for Lutes' residence. Trull and Morford testified to essentially the same facts in the suppression hearing. There appears to be no question that Trull and Morford had probable cause for Lutes' arrest at the time they served the search warrant, or, at the latest, at the time Lutes arrived home and was arrested.
Addressing Lutes' argument that the search was excessively intrusive, suffice it to say that the record does not disclose a search so unreasonable in nature that the fruits of it should be suppressed.
Shifting to a review of the trial court's decision to admit Lutes' statements, this Court's precedent has been clear.
In order for a confession to be admitted into evidence, it must have been given freely and voluntarily, and without the influence of promises or threats. Frost v. State, 483 So.2d 1345 (Miss. 1986). A confession which in truth is not voluntary, which comes about as a result of threat, physical mistreatment, or the promise of reward, cannot be used either for the State's case in chief or for impeachment purposes. Powell v. State, 483 So.2d 363 (Miss. 1986).
"[W]here a criminal defendant challenges the voluntariness of a confession, he has a due process right to a reliable determination that the confession was in fact voluntarily given." Gavin v. State, 473 So.2d 952, 954 (Miss. 1985). See also, Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).
In a hearing to determine the admissibility of a confession, the trial judge is the trier of fact and is charged with determining whether there has been, under the totality of the circumstances, a knowing and voluntary waiver of the accused's privilege against self-incrimination. Gavin v. State, 473 So.2d at 954. See also, Jones v. State, 461 So.2d 686, 696 (Miss. 1984); Depreo v. State, 407 So.2d 102, 106 (Miss. 1981). "[T]he State has the burden of proving all facts prerequisite to admissibility beyond a reasonable doubt." Gavin, 473 So.2d at 954.
"Age and intelligence level are factors to be considered in determining whether a waiver and a confession are free and voluntary, but are not controlling." Coleman v. State, 378 So.2d 640, 644 (Miss. 1979). See also Saucier v. State, 328 So.2d 355 (Miss. 1976); Stewart v. State, 273 So.2d 167 (Miss. 1973).,
Once the trial judge determines that a confession is admissible, his finding becomes a finding of fact which will not be reversed on appeal unless it is manifestly in error or contrary to the overwhelming weight of the evidence. Frost v. State, 483 So.2d 1345 (Miss. 1986); Gavin v. State, 473 So.2d 952 (Miss. 1985).
Cabello v. State, 490 So.2d 852, 856 (Miss. 1986); White v. State, 495 So.2d 1346, 1347 (Miss. 1986).
There is no question that Lutes was informed of his rights as required by the Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) decision. At the beginning of each statement, Lutes acknowledged that he understood his rights and that he was agreeing to talk.
Lutes points principally to two things which he argues demonstrate that his subsequent statements were not freely and voluntarily given. First, Lutes maintained that officers played off Lutes' wife's arrest to obtain the waiver of his right to silence.
The state correctly points out, and the record indicates, that Lutes was advised that his wife was under arrest for possession of marijuana found growing on the premises. Lutes then inquired if the charges could be dropped but was told that the officers had no authority to do this. Sgt. Morford of the Louisiana State Police, *549 who was present during Lutes' questioning, specifically denied that Lutes was told "you don't want us to have to take her to jail." The trial court was well within the evidence in determining the wife's treatment not to be indicative of impropriety undermining Lutes' waiver.
Second, Lutes argues that his statements were made when he was misled as to their import. He argues that he was arrested on one charge but questioned concerning a second more serious charge.
The United States Supreme Court recently held that "a suspect's awareness of all possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his fifth amendment privilege." Colorado v. Spring, ___ U.S. ___, ___, 107 S.Ct. 851, 859, 93 L.Ed.2d 954 (1987).
The Court rejected the Supreme Court of Colorado's decision that the Fifth Amendment requires the subject matter of the interrogation to be considered as a factor in determining the validity of a waiver. However, as Justice Marshall stated in dissent, the Court's holding did not prevent states from deciding that knowledge of the subject matter of an interrogation is a factor for consideration under state law. Id. at ___, n. 2, 107 S.Ct. at 862, n. 2. (Marshall, J., dissenting)
This Court has not decided the precise question, and we need not decide this question today. Even assuming this Court would consider Lutes' knowledge of the subject matter as a factor in the totality of the circumstances weighing on the validity of a waiver, there is still ample evidence to support the trial court's finding. The testimony at the suppression hearing belies Lutes' claim of "invidious trickery," and supports the trial court's determination that the waiver was voluntary despite questioning related to a crime not charged.
Lutes was presented the warrants for his arrest on charges of forgery and credit card misuse at his home. However, before taking Lutes' statement, he was also informed that Ernest Jackson, at the time the Chief Deputy Sheriff of Lauderdale County, was present in regard to an investigation into the death of the man who owned the credit cards he was accused of illegally using. The transcript of Lutes' recorded statement makes clear that he was informed that officers wanted to talk with him about the murder investigation. It was the first thing mentioned by the investigating officers.
Finally, Lutes also argues that the same trickery carried over to the second statement Lutes gave officers on July 15, 1983, the day after his arrest on the credit card charges.
After Lutes' first statement the night of his arrest, Lauderdale County authorities sought and obtained a warrant charging Lutes with capital murder. Investigator Boxx with the Mississippi Highway Patrol drove the warrant to Louisiana so it could be served upon Lutes on July 15, 1983.
Lutes testified at the suppression hearing that he was never given the warrant from Lauderdale County charging him with capital murder. The testimony of Chief Deputy Jackson is in direct conflict. Jackson testified that he presented Lutes with the warrant before any further questioning.
Applying our precedent to the facts, it appears the trial court did not commit error in determining that the statements were voluntarily given after a knowing and intelligent waiver. Cabello and White, supra.

III.

WAS THE JURY VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE CREDIBLE EVIDENCE, OR DID THERE EXIST INSUFFICIENT EVIDENCE FOR THE JURY TO FIND LUTES GUILTY BEYOND A REASONABLE DOUBT?
Though Lutes argues the weight and sufficiency of evidence did not support the jury's verdict, the thrust of his argument centers around the testimony of Robert Griffin. Lutes basically argues that his testimony is the only evidence worthy of belief. This appears to be no more than a *550 complaint that the jury incorrectly believed Griffin over Lutes. Unfortunately, (for Lutes) the weight and credibility to be afforded evidence is the province of the jury. See Van Buren v. State, 498 So.2d 1224, 1229 (Miss. 1986); Harveston v. State, 493 So.2d 365 (Miss. 1986); Neal v. State, 451 So.2d 743, 758 (Miss. 1984); Groseclose v. State, 440 So.2d 297, 300 (Miss. 1983); Gathright v. State, 380 So.2d 1276, 1278 (Miss. 1980).
Given our limited scope of review of the sufficiency of the evidence, see Van Buren, 498 So.2d at 1228, we find Lutes' argument under this assignment of error to be without merit.
Having carefully reviewed the record and concluding that Richard Lutes received a fair, albeit not perfect, trial, and finding no reversible error, the judgment and sentence of the Circuit Court of Lauderdale County is hereby affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and GRIFFIN and ZUCCARO, JJ., concur.
ROBERTSON, PRATHER, SULLIVAN and ANDERSON, JJ., dissent.
ROBERTSON, Justice, dissenting:
The change of venue issue in this case is controlled by our recent decisions in Fisher v. State, 481 So.2d 203, 214-24 (Miss. 1985); and Johnson v. State, 476 So.2d 1195, 1209-17 (Miss. 1985). It is my view that we should continue to adhere to Fisher and Johnson as a matter of principle and as a matter of policy, and that we should reverse the Lutes case and remand for a new trial in a changed venue.

A. The Question of Principle

The most fundamental principle known to our law is that like cases should be treated alike. It is the basis for stare decisis. Johnson and Fisher were reversed because of the massive pre-trial publicity. The Lutes case arose in the same county and in the same year. In relevant part, Lutes is factually indistinguishable from Johnson and Fisher  a fact conceded by the primary culprit in this whole situation: The Meridian Star. In an editorial written following our decision in Johnson, The Meridian Star said of Lutes
[In light of Johnson] reversals can also be expected in two other celebrated local murder convictions  those of Richard Lutes in the death of developer Larry Tiffee and Larry Fisher in the slaying of schoolgirl Melinda Gail Weathers.
* * * * * *
The Tiffee and Weathers cases received even more publicity [than Johnson].
* * * * * *
The Tiffee murder case ... received much more widespread publicity in Meridian and Lauderdale County than did the slaying of Mrs. Grogan [by Leon Johnson].
True, since we decided Johnson and Fisher we have affirmed refusals to change venue on several occasions. In each of these cases, the pre-trial publicity was qualitatively and quantitatively less than in Johnson and Fisher. Here in the Lutes case the pre-trial publicity was qualitatively and quantitatively more.

B. The Question of Policy

Since Johnson and Fisher were decided, trial courts have been much quicker to grant change of venue in highly publicized cases, particularly capital cases. The change of venue policies we initiated in Johnson and Fisher are working, a fact I trust will merit respect notwithstanding today's decision. If it ain't broke, why fix it?
By working, of course, I mean that people are getting fair trials. The prosecution is still getting quite a few convictions and some death sentences even though venue has been changed. On the other hand, some cases are resulting in non-capital sentences and even acquittals  cases which, as a matter of common sense, we know would have resulted in different, more severe verdicts had there been no change of venue.
Since Johnson and Fisher were decided, there have been at least three capital murder *551 trials in changed venues which resulted in not guilty verdicts. These were:
(1) Mary Jo King: transferred from Lafayette County to Union County and ultimately to Forrest County where it was tried in March of 1979;
(2) Richard Robby Storey: transferred from Alcorn County to Pontotoc County and ultimately to Attala County where it was tried in June of 1987;
(3) Gary Lee: transferred from Attala County to Lowndes County where it was tried in January of 1987.
In addition, we all know what happened to Fisher and Johnson on remand. In Lauderdale County, Fisher had been convicted of capital murder and sentenced to death. On retrial in Rankin County, Fisher was found not guilty. In Lauderdale County, Johnson had been convicted of capital murder and sentenced to death. On retrial in Jackson County, Johnson was retried and given a life sentence.
The attached chart reflects a breakdown of the results in 33 murder cases disposed of since Johnson and Fisher were decided and where venue was changed.

C. Today's Decision

The majority's offering is quite lame. After reviewing the case law  and reaffirming Johnson and Fisher, the majority quite correctly concludes that the Circuit Court "should have changed the venue." This failure somehow fails to generate reversal because, as I see it, the jury was in fact fair. Cited as evidence of this fairness are that "no reasonable jury could have reached a different verdict" and that Lutes was not sentenced to death.
The Court kids itself. Lutes never admitted killing Larry Tiffee or even intending or contemplating Tiffee's death. As the majority put it, Lutes told the jury he "had become an unwitting scapegoat who never intended to be a party to a murder." Whatever credibility that story may otherwise have had, its chances of being believed were beyond doubt substantially diminished by the massive and highly prejudicial pre-trial publicity in this case.

D. Conclusion

My view is quite simple. As a matter of principle, we should reverse. There is no way this case can be factually distinguished from Johnson and Fisher. As a matter of policy, we should send out a clear signal that Johnson and Fisher are still the law. The rule of those cases is working too successfully to justify any change.
PRATHER, SULLIVAN and ANDERSON, JJ., join in this opinion.
*552 
*553 ANDERSON, Justice, dissenting:
Although I do not agree with the holdings in Fisher v. State, 481 So.2d 203 (Miss. 1985) and Johnson v. State, 476 So.2d 1195 (Miss. 1985), they are the law. I agree with Justice Robertson that we should follow the law we have established.
I respectfully dissent from the majority.