566 So.2d 1194 (1990)
Jerry FOWLER
v.
STATE of Mississippi.
No. 07-KA-59042.
Supreme Court of Mississippi.
August 1, 1990.
*1195 Donald J. Steighner, Kittanning, Pa., for appellant.
Jerry D. Fowler, Columbus, pro se.
Mike C. Moore, Atty. Gen., John R. Henry, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and ROBERTSON and BLASS, JJ.
ROBERTSON, Justice, for the Court:

I.
Jerry Fowler appeals his conviction of manslaughter and presents questions regarding discovery and evidence and the trial court's instructions to the jury. We have considered the matter with care and find that, although no one witnessed the homicide other than Fowler himself, no legal error appears requiring reversal, and the judgment below must be affirmed.

II.
In the early morning hours of Sunday, September 1, 1985, thirty-six year old Jerry Fowler, proprietor of Hooter's Lounge, shot and killed nineteen year old Sammie Richardson near the lounge in Columbus, Mississippi. Fowler immediately called the police, who arrived within a minute and investigated the homicide and the scene extensively, including questioning of Fowler.
Time went by and, four days short of the second anniversary of the homicide, the grand jury of Lowndes County returned an indictment charging that Fowler murdered Richardson. Miss. Code Ann. § 97-3-19(1)(a) (Supp. 1985).
The case was called for trial some three months later. The prosecution produced circumstantial evidence to prove that Fowler had shot Richardson outside the rear door of Hooter's Lounge and had dragged the body into the bar to create the appearance that Richardson had been a burglar who was shot in the commission of a crime.
Hooter's Lounge is located at 106 22nd Street South in Columbus. The building's exterior dimensions are approximately 40 feet east and west by 81 feet north and south. A bar runs along the south wall with tables located from the center of the building to the north wall. There is a room on the east side of the building separated completely from the rest of the lounge where owner/proprietor Hooter slept and lived. Sometime after 3:00 a.m. on the morning of September 1, 1985, Fowler shot Richardson with his 30/30 rifle, killing him instantly. Responding to Fowler's call, Detective Donald Freshour arrived within minutes and at trial described his investigation through a series of photographic exhibits.
In support of the prosecution theory that Fowler had murdered Richardson, Detective Freshour and others offered evidence which showed:
(1) There was no blood or other matter splattered on the walls or the inside part of the door;
(2) There was a blood splatter on the outside face of the door and the adjoining wall which looked to be part of the same pattern;
(3) There was grass and other debris consistent with that outside the rear door  the rest of the interior of the building was free of any debris;
(4) There was a piece of cardboard like that outside the rear of the building wedged between the feet of Richardson's body;
(5) The blood streaks found on the floor were linear, indicating the body was dragged in the rear door, rather than circular which would have been more consist with Fowler's version of what happened.
(6) All traces of splattered blood and skull fragments were found on the outside of the building.

*1196 (7) A cap with traces of hair probably belonging to Richardson was found on the ground outside the rear door.
The prosecution also called Dr. John Parker, the coroner, to explain the angle of the head wound and its inconsistency with the gun being fired from waist level as Fowler claimed. Dr. Parker noted the absence of any trail of blood consistent with the body being swung around and the absence of any splattering on the interior of the lounge. Forensic scientists from the state crime lab reported on results of tests run on the physical evidence that substantiated the evidence highlighted in the photographs.[1]
Fowler's defense was self-defense and defense of habitation. He testified that he closed the lounge at midnight on August 31. He says he padlocked the front door and went around to the rear and re-entered and worked cleaning up for an hour to an hour and a half and then went to bed. Sometime after 3:00 a.m., Fowler says he was awakened by a noise that sounded like someone breaking in the rear door. He got out of bed, put on some clothes and says he looked into the bar area where he could see someone standing in the doorway of the rear door. Fowler went back to his room and retrieved his 30/30 rifle. He says he worked his way from the bedroom to the south wall, then down along the side the bar. By this time, he said the intruder was some three to four feet inside the building. Fowler was six or seven feet away when he said, "Just stand still and don't move." He said the intruder was turned sideways, looking back toward the rear door as if somebody or something were there. Fowler described his version of what happened next:
Well, after I told him to stand still and don't move, he took a step toward me, he said "You son of a bitch," and jumped at me. And I saw something in his hand, and I thought it was gun when he turned. And it was just automatic. I just  I shot him before I knew it ... At the time I shot him, I know what he had. But when he fell backwards, I saw the two-by-four fall from him.
Fowler said the intruder's body fell backward and landed with his head approximately one to one and a half feet outside the threshold of the rear door, that is, where the photographs of the scene show a puddle of blood and brain matter. Fowler said he started toward the phone to call the police and an ambulance when he heard someone else running over the gravel outside the rear door.
In due course, the jury returned a verdict that Fowler was guilty of the lesser offense of manslaughter. The Circuit Court sentenced Fowler to ten years imprisonment in the custody of the Mississippi Department of Corrections. Miss. Code Ann. § 97-3-25 (1972).
Fowler appeals his conviction and sentence to this Court.

III.
Fowler first argues that the Circuit Court erred when it received into evidence, over his objection, evidence of certain oral statements he had made to police officers on the morning of September 1, 1985, some five hours following the homicide. According to notes Officers Freshour and Bowden had recorded,[2] Fowler stated:
On 9/1/85 I went to sleep around 2:00 a.m. I was awakened by a noise at the back door. I came out and saw someone standing in the rear doorway just under the exit light. I went and got my rifle. I went back into the lounge area. I told him to stay where he was. He stopped for a minute. I could see a 2 X 4 in his hand. I didn't see the 2 X 4 until he *1197 raised it at me. The door was standing open and he was standing inside. Now that I think about it the door would not have stayed open by itself so someone had to be holding it. I had the gun at waist level and fired at him. He fell just inside the door a few feet. I heard someone else outside. I pulled the boy I shot out of the way where I could get out the door. I heard someone running away from the building. I looked but didn't see anyone. Before I shot the black boy he had raised the 2 X 4 at me and took a step toward me and said, "You son of a bitch," or something like that. I just shot automatically. I didn't know it was a 2 X 4 until I had shot him. I thought it was a gun or something like that. After all this happened I called the police and told the police to call the ambulance. I don't remember taking the gun back to the room. The only blood I saw on the boy I shot was on his arm when I pulled him out of the way to get out of the back. He was lying on his side on the 2 X 4. He fell backwards when I shot but he was inside the door a few feet when I shot him. I moved the 2 X 4 a little bit but not too much that I can remember. I was thinking that Johnny Redden and Billy Jordan had sent someone to get me. All this was on my mind when I say the man in the back door. Last week someone tried to break in the back door of my place. I ran them off. I didn't see who it was.[3]
The original copy of Fowler's statement, State's Exhibit 44, written in longhand by Detective Pete Bowden as told by Fowler states "I told him to stop" instead of "I told him to stay where he was" as appears in the typed version. The copy entered in evidence as State's Exhibit 5 was dictated from the original longhand by Detective Bowden and transcribed by his secretary.
Prior to questioning, Officers Freshour and Bowden testified that they gave Fowler the standard Miranda warning. See Rule 1.03, Miss.Unif.Crim.R.Cir.Ct.Prac. (1979); Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966). Fowler makes no point of this, although he never signed a written waiver of his rights, but instead he argues on appeal that still his statement was not "knowing and intelligent" for the reason that the officers had not told him what crimes he might be charged with. Fowler says at the time he made the statement he believed he had been justified in shooting Richardson and was simply unaware that he was in any way a suspect.
We begin with the fact that the officers advised Fowler that anything he said might be used against him in a court of law. The Supreme Court of the United States has held such advice constitutionally adequate, Colorado v. Spring, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), although we have pretermitted the question whether Spring would be followed as interpretive of this state's constitutional privilege against self-incrimination. See Lutes v. State, 517 So.2d 541, 549 (Miss. 1987). That Fowler declined to sign the statement, under these facts, does not deprive it of admissibility. See Connecticut v. Barrett, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987); Craft v. State, 380 So.2d 251, 254 (Miss. 1980).
Fowler makes no challenge to the fact that he was given the full Miranda warning. He makes no claim that he failed to understand these warnings. Fowler had witnessed a painstakingly detailed investigation of the scene several hours earlier. The officers had requested that he accompany them to the police station in order that they might question him about the details of the shooting. The fact that he declined to sign anything without having an attorney present reflects Fowler's awareness of the seriousness of the proceedings and his involvement in them. Receipt and understanding of advice that anything he said might be used against him is legally adequate that we may regard his statement voluntary, knowingly and intelligently made.
*1198 We perceive untoward practical consequences from the arguments Fowler advances. He would have us add to the familiar Miranda warnings the requirement that officers advise a suspect of all specific possible criminal consequences. One of the virtues of Miranda is its clarity. The warnings are the same in every case. Adding the requirement that the officer inform the suspect of specific criminal consequences would add a component variable from case to case and undermine the simplicity and bright-line character of the rule as it stands. We decline Fowler's invitation and find his point without merit.

IV.
Fowler next argues that the Court erred when it denied his motion for a mistrial predicated upon his claim that the prosecution failed to provide pre-trial discovery as required by Rule 4.06, Miss.Unif.Crim.R. Cir.Ct.Prac. (1979, as amended). It appears that the prosecution had possession of two tape recordings which had been made on the morning of the homicide by Columbus Police Department radio dispatcher, Craig Taylor, neither of which were disclosed to Fowler in discovery. It might be added that the prosecution did not offer either tape in evidence, either.

A.
We will consider the two tape recordings separately. First, the prosecution held a recording of Fowler's telephone call wherein he reported the homicide. Dispatcher Taylor testified that at 3:21 a.m. on September 1, 1985, he received a telephone call from Fowler reporting that a man had broken into his business and he had shot him, that he thought the man was dead but that in any event, he was bleeding a lot and that an ambulance and the police should be sent. In the course of Taylor's testimony at trial, he acknowledged that he had refreshed his memory by listening to the tape recording, perhaps implicating Rule 612, Miss.R.Ev., as well as our criminal discovery rules. At this point Fowler objected and complained that he did not know of any such tape, had not heard it, and that it should have been provided in discovery. The Court then ordered a recess and allowed Fowler's counsel to listen to the tape. The prosecuting attorney acknowledged that he had failed to disclose the tape to defense counsel but said this was because police officers had told him the tape had been destroyed, information which was obviously in error.
Fowler argued below, as here, that the recording contained exculpatory material and that this required its pre-trial disclosure. Without question, the tape should have been disclosed, but we find that the Circuit Court listened to it and stated for the record that it contained no exculpatory information. We, too, have listened to the tape and find nothing in it of an exculpatory nature. Compare Barnes v. State, 460 So.2d 126, 132-35 (Miss. 1984). All Fowler can point to is the inflection in his voice, the time of the call, and exactly what was said. We find no basis for believing that the recording contains any information which would have led to the discovery of other evidence which might have been of benefit in his defense, nor any information which he may have used in his defense directly had he offered it at trial. This then is one of those rare cases where the prosecution's failure to disclose evidence that ought to have been disclosed in discovery results in harmless error. Carraway v. State, 562 So.2d 1199, 1204-05 (Miss. 1990); Hall v. State, 546 So.2d 673, 676-77 (Miss. 1989); Burkhalter v. State, 480 So.2d 1128, 1129 (Miss. 1986).

B.
The second tape recording was of a different nature and content. Sometime after Fowler had reported the homicide, another individual who refused to identify himself telephoned the police department and talked to Dispatcher Taylor and described the shooting as the aftermath of an aborted drug transaction. The caller told of how the person who had done the shooting had fronted the victim some drugs. When the victim returned without the money for the drugs, he was shot.
*1199 The prosecuting attorney stated he was aware that this tape recording was not admissible as evidence and that he did not intend to offer it, although he would agree to have it admitted if Fowler wished. Fowler's attorney was allowed full opportunity to listen to this tape and as well the Court during the recess listened to the tape. Again, the prosecution reported that it had not disclosed the tape because of the now seen erroneous information that the tape had been destroyed.
Fowler argues that this tape was discoverable as exculpatory material. We have reviewed the transcript and listened to it and find nothing in it exculpatory and a great deal which, directly or indirectly, would have been quite damaging to Fowler's case if admitted. Fowler suggests that this tape confirms his theory that a second person was involved. He argues that, if this tape had been available to him sufficiently in advance of trial, he may with diligence have been able to locate the second person and that this may have led to evidence which might have proven exculpatory at trial. This point fails for Fowler's theory from the beginning was that a second person was present, yet no second person was produced as a witness at trial, and, to the point, nothing in this tape provides any clues which might have aided identification or location of any such second person.
As before, we hold that this tape recording should have been produced in discovery. On the other hand, we find nothing in it which raises the slightest doubt in our minds that failure to produce the tape in discovery was harmless error. The Circuit Court committed no error requiring reversal when it denied Fowler's motion for a mistrial.

V.
Fowler next complains that the Court erred when it sustained certain prosecution objections to opinion testimony he had tendered through his expert witness, Dr. Milton Cox. Fowler called Cox in his defense, the Court accepted him as an expert in alcohol analysis, blood analysis (serology), blood pattern and stain interpretation, crime scene reconstruction, ballistics, firearms, tool marks and trace evidence.
Dr. Cox then proceeded to testify, describing the physical evidence, particularly the blood drops and the significance of their shape in determining the angle and direction from which they came. While explaining a photograph of the large puddle of blood and brain matter just beyond the threshold of the rear door, Dr. Cox stated "The blood stains are arterial blood squirt from the right side of [Sammie Richardson's] head." The prosecution objected on the grounds that the statement was "rank speculation in that he has no way of knowing whether it's arterial blood that comes from the right side or whether it came from the man's finger... ." The Court sustained the objection.
Next Dr. Cox testified concerning the origins of the blood stains on the outside bottom corner of the door. He explained how the blood could have gotten on the door consistent with Fowler's explanation and did so with no objections. When shown two separate photographs, Dr. Cox gave his opinion that one was an "extension" of the other  an opinion to which the prosecution objected on the grounds Dr. Cox was not competent to so testify. The Circuit Court sustained the objection on the grounds there was no way to tell this from viewing the photographs.
Next Dr. Cox testified concerning pliers found on the ground outside the rear door that Fowler implies Richardson used to break into the lounge. Dr. Cox noted that while the pliers did not yield any particles that could be identified as wood, much less wood from the door, this was not conclusive due to the fact that the surface of the pliers that would have been used to pry the door open, the handle, was such that wood particles might not adhere to the pliers. Further, it would be virtually impossible to estimate the recentness of any pry marks on the door. This testimony was heard by the jury without objection.
Dr. Cox further testified concerning the nature of the weapon, a 30/30 rifle, with which Fowler shot Richardson. He described *1200 how, if Richardson were shot at close range inside the lounge with the door open behind him, the momentum of the shell might carry the skull fragments and other matter outside the rear door without splattering any matter on the inside walls of the building. He also explained how the apparent angle at which the bullet struck the head would not necessarily indicate the angle from which the gun was fired. The tilt of the head could alter the apparent angle drastically. This testimony was likewise heard by the jury without objection.
Fowler's counsel attempted to have Dr. Cox give an opinion concerning the effect a blood alcohol content of 0.14%, the level in Richardson's blood at the time of the autopsy, would have on the ability of a person to ride a bicycle. The purpose of the testimony was to provide an explanation for ground in dirt found on Richardson's right pant leg. The prosecution objected to this testimony on the grounds that Dr. Cox was not able to give any such opinion with reasonable certainty. The objection was sustained on the grounds that answer would be purely speculative. Finally, in concluding direct examination, several objection for evidence being cumulative were sustained.
On redirect, several objections were made concerning questions about whether the blood stains on the bottom outside corner of the door might have occurred while the body was moved in the course of the investigation. The objections were sustained on the grounds that the evidence failed to support this possibility and, in fact, showed the photographs of the door to have been taken prior to the body being moved. Finally, Dr. Cox was again allowed to give his opinion that, under the circumstances propounded to him by Fowler's counsel, the skull fragments and other matter could have carried out the door without leaving any traces on the inside walls of the building.
Rules 702, et seq., Miss.R.Ev., afford our trial judges a certain level of discretion regarding receipt and presentation to the jury of expert opinion testimony. Vickery v. State, 535 So.2d 1371, 1379-80 (Miss. 1988). Expert witnesses, however, qualified, may not present the jury with rank speculation. West v. State, 485 So.2d 681, 686 (Miss. 1985). The Circuit Court here acted well within the bounds of sound discretion. We say this in the context of our finding that as a whole, Fowler was allowed fully to present his theory of the case through his expert witness, Dr. Milton Cox. The assignment of error tendered here is without merit.

VI.
Fowler argues that the Circuit Court erred when it refused to instruct the jury on his theory of the case. He refers to the fact that he claimed throughout that he was acting in self defense and in defense of habitation, citing our familiar rule that he may have the jury instructed of his theory of defense if it is supported by substantial credible evidence. See Meese v. State, 539 So.2d 1324, 1334-36 (Miss. 1989); Young v. State, 451 So.2d 208, 210 (Miss. 1984).
We find that the jury was instructed on the theory of self defense via Instruction S-4A[4] and on the theory of defense of habitation via Instruction S-5A.[5] Moreover, *1201 Instructions S-2A and S-3A which defined the elements of the offense included language such as "without authority of law and not in necessary self defense or necessary defense of habitation," which again alluded to Fowler's theory of the case. It is true that Fowler had originally requested an instruction on self defense and defense of habitation, Jury Instruction D-18, but the record reflects that he withdrew that request.
We have reviewed the Court's charge to the jury as a whole and find it more than adequate to present Fowler's theory of the case. See Rose v. State, 556 So.2d 728, 734-735 (Miss. 1990); Butler v. State, 544 So.2d 816, 818-19 (Miss. 1989). Moreover, we find that Fowler withdrew all other instructions he had pre-filed and which related to his theory of defense. Under these circumstances, we find no error in the present assignment.

VII.
Fowler does not challenge the sufficiency of the evidence to undergird his conviction of manslaughter, but he does argue that its weight is such that a new trial should be ordered, something of an against-the-overwhelming-weight-of-the-evidence variation on a theme by Weathersby v. State, 165 Miss. 207, 209, 147 So. 481, 482 (1933). To be sure, the case against Fowler is largely circumstantial, although he freely admits that he shot and killed Richardson.
We have carefully reviewed the record and the evidence in light of our familiar standards and find no basis for holding that the Circuit Court abused its discretion when it denied Fowler's motion for a new trial. See, e.g., Jackson v. State, 551 So.2d 132, 147-48 (Miss. 1989). Beyond this, accepting that it may be difficult to squeeze the facts before us within any legally accepted definition of manslaughter, we have held in a number of cases and in a wide variety of context that, where there is in the record evidence legally sufficient to support a finding of guilty of murder, had the jury so found, the defendant will not be heard to complain that a manslaughter instruction was given. Jackson v. State, 551 So.2d 132, 146 (Miss. 1989); Crawford v. State, 515 So.2d 936, 938 (Miss. 1987). Today's is such a case.
JUDGMENT AND SENTENCE OF TEN YEARS IN MDC FOR MANSLAUGHTER AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
NOTES
[1] The prosecution obviously believes that Fowler fronted Richardson in illegal drug operations and that, on the occasion in question, Richardson had returned without delivering funds Fowler was obviously expecting, and that in consequence Fowler murdered Richardson. No evidence suggesting this theory, however, was presented to the jury.
[2] The officers apparently wrote down what Fowler said in anticipation that he would sign a written statement. Fowler, however, refused to sign the statement without having an attorney present.
[3] At trial, Fowler claimed he did not make the statements that are underlined above.
[4] Instruction S-4A as given to the jury reads as follows:

The Court instructs the Jury that to make a killing justifiable on the grounds of self defense, the danger to the defendant must be either actual, present and urgent, or the defendant must have reasonable grounds to apprehend a design on the part of the victim to kill him or to do him some great bodily harm, and in addition to this he must have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. It is for the jury to determine the reasonableness of the ground upon which the defendant acts.
[5] Instruction S-5A as given to the jury reads as follows:

The Court instructs the Jury that a person is justified in taking a life in defense of his habitation where it is actually or apparently necessary to do so in order to repel another person who attempts to enter in a forcible or violent manner for the apparent purpose of committing a felony upon either a person or property which is inside, or offering personal violence to a person living or being inside. However, a homocide is not justifiable where although the deceased is attempting at the time to enter the defendant's dwelling house, the killing is done with malice and ill will and not for self protection or protection of the habitation.
Therefore, if you find from the evidence in this case beyond a reasonable doubt that although Sammie Richardson was attempting at the time of his death to enter Hooter's Lounge, and that Hooter's Lounge was in fact the dwelling of the defendant, Jerry Fowler, and further that Jerry Fowler killed Sammie Richardson with malice and ill will, and not for self protection or protection of his dwelling, then the killing was not justifiable as a defense of habitation.