# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-KA-00782-SCT

*HAROLD LEE HENLEY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/25/96 |
| TRIAL JUDGE: | HON. JOHN M. MONTGOMERY |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DONNA SUE SMITH |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: WAYNE SNUGGS |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 12/10/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 12/31/98 |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

## INTRODUCTION

¶1. Harold Lee Henley was indicted by the Lowndes County Grand Jury for grand larceny, aggravated assault, and attempted rape. Henley was tried before a jury and convicted of all counts. He was sentenced to 5 years for grand larceny, 8 years for attempted rape, and 18 years for the aggravated assault with all sentences to run consecutively. The Lowndes County Circuit Court, Honorable John M. Montgomery, denied Henley's motion for a J.N.O.V. or, alternatively, a new trial. Henley appeals to this Court and assigns the following as error:

> **I. THE CIRCUIT COURT ERRED IN ALLOWING HAROLD HENLEY TO ACT *PRO SE* WHEN HE ADVISED THE COURT THAT HE NEVER "REQUESTED TO**

**PROCEED WITHOUT A LAWYER."**

**II. THE CIRCUIT COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION FOR J.N.O.V. OR, ALTERNATIVELY, FOR A NEW TRIAL ON THE GRAND LARCENY COUNT OF THE INDICTMENT.**

**III. THE CIRCUIT COURT ERRED IN DISALLOWING THE DEFENDANT'S CHALLENGE TO VENIRE PANELIST NUMBER 19.**

**IV. ATTORNEY ROBERT PRATHER PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL TO THE DEFENDANT AND THIS INEFFECTIVE REPRESENTATION SERIOUSLY PREJUDICED HAROLD HENLEY'S DEFENSE.**

## STATEMENT OF THE FACTS

¶2. On the evening of May 17, 1996, Martha Fields ("Fields") was walking on Eleventh Street in Columbus, Mississippi. Harold Henley ("Henley"), who was driving around looking for some crack to smoke, stopped Fields. Fields and Henley knew each other, as they had met at Alcoholics Anonymous sometime before. It is undisputed that Henley and Fields went back to Henley's house. Their stories diverge as to the purpose of the visit and the events which transpired once they arrived.

¶3. Fields testified that Henley asked her to go to his house and she thought it was alright because they were good friends. Once they arrived, Henley started asking her for sex, but she refused. After she refused his sexual advances, Fields testified that Henley placed something against the door so that she could not get out. Fields and Henley, who, according to Fields, had a Jack Daniels bottle in his hand, started fighting inside the house. Henley punched Fields in the eye and knocked her unconscious. When she came to, Henley was wiping her face with a rag. Fields tried to escape by breaking the window but was unsuccessful. She testified that Henley then tore her jumpsuit and panties off. On cross examination, Fields said that she took her jumpsuit off because Henley was holding a beer bottle to her head.

¶4. Fields testified that Henley, who had taken his own clothes off, was on top of her trying to force her to perform oral sex on him. Henley was armed with knife, and according to Fields, made numerous cuts on her hands, arms, neck, and shoulders. As Henley was sitting on top Fields, holding her down, she reached and grabbed Henley by his testicles. After Fields gained control over Henley, she guided him over to the door and she ran out naked. After the police arrived on the scene, Fields was carried to the emergency room by ambulance where she received treatment and was released.

¶5. Henley's version of the events is drastically different from Fields' testimony. Henley testified that he was driving around looking for crack cocaine when he saw Fields walking along the street. He said that he knew her from AA and Narcotics Anonymous meetings. After picking Fields up, they rode around and purchased some crack cocaine from a guy named Shay. According to Henley, Fields agreed to give him sex in exchange for some of the crack cocaine.

¶6. The two then went to Henley's house to complete their alleged deal. Once there, Henley testified that Fields performed fellatio on him, but she refused to have sex with him unless he gave her some crack. Henley claims that after taking a hit of crack, Fields took her clothes off, but refused to consummate their deal. After that, a struggle ensued between the two.

¶7. Henley admitted that he hit Fields and tried to wipe her injury with a rag. However, he said that Fields removed her clothes herself. He said that he became inflamed with passion from the drugs and was angry when she reneged on her prior agreement to have sex. He admitted to threatening Fields with the knife but denies that he cut her. Henley said that Fields just walked out without her clothes on, and that the struggle lasted 30 minutes as opposed to three hours.

¶8. Donald Richardson, a Columbus Police Officer, responded to the 911 call concerning an attempted rape. Upon arrival, he saw Fields running naked to a house. After someone gave her a blanket, Richardson attempted to calm her down and obtain a statement from her. Richardson observed that multiple injuries had been inflicted upon Fields' person. She had a cut underneath her left arm, a deep cut above her eye, and a deep cut under her breast.

¶9. Richardson and several other officers went to Henley's home. Upon arrival they noticed that the back door was open and the house was dark.[1] Believing the suspect to still be inside, the officers proceeded to search the house. Henley was not there. The officers noticed, in addition to the house being in a total state of disarray, that there was blood on the carpet, mattress, and walls inside the house.

¶10. After Fields had left the house but before the police arrived there, Henley had panicked and also left. Despite having his own truck, Henley stole a truck that had the keys in it from down the street. He drove to Bartlett, Tennessee, where he was pulled over by a police officer. The officer ran a check on the truck's tag number and found out it was stolen. Henley was arrested and detained in Tennessee.

¶11. A search warrant was executed on Henley's home the next day. The officers were looking for Fields' clothing and the hook-billed knife that was used in the attack. The officers did not find any female clothing[2] but did find the knife along with blood on the carpet, walls, and mattress. Pieces of the carpet, a piece of the mattress, the knife, a shirt, and some swabs retrieved from Henley's house all tested positive for the presence of human blood. However, no test was performed on these items to determine whether the blood belonged to Fields.

### I. THE CIRCUIT COURT ERRED IN ALLOWING HAROLD HENLEY TO ACT *PRO SE* WHEN HE ADVISED THE COURT THAT HE NEVER "REQUESTED TO PROCEED WITHOUT A LAWYER."

¶12. After completion of the first day of a two day trial, Henley expressed to the judge his unhappiness with his lawyer, Robert Prather ("Prather"), now deceased.[3] Outside the presence of the jury, and with Prather, the prosecutor, and the judge present, Henley expressed his complaints to the court. He claimed that his lawyer had been hostile to him by not talking to him on the telephone and that Prather had spent less than ten minutes with him preparing for his case. Prather was asked by the court if he had anything to put in the record. After Henley had made his complaints to the trial judge, the following exchange occurred:

THE COURT: All right, Mr. Prather, do you care to place anything in the record?

Mr. Prather: Your Honor, the only thing I would do is move now to be allowed to withdraw since he has accused me of being ineffectual assistance of counsel, . . .

Later, Prather did tell the judge that he had hung up on Henley because he was in the shower and it was his policy not to accept public defender calls at his home. Despite Henley's contentions of conflict between himself and Prather, his primary complaint was that Prather did not cross-examine the victim extensively

enough. He claimed that Fields was lying and he did not want to go to prison without having the chance to address the statements of Fields.

¶13. A criminal defendant has the right to be heard by himself or counsel or both. Miss. Const. art. 3, § 26. A refusal by the trial court to permit the defendant to argue his case is a violation of his constitutional rights and requires reversal. *Gray v. State*, 351 So.2d 1342, 1345 (Miss. 1977).

¶14. Recently, this court has turned to a "hybrid representation" in an effort to strike a balance between the right to counsel and the right to self-representation. *Metcalf v. State*, 629 So.2d 558, 562 (Miss. 1993). Hybrid representation encompasses both the participation of the criminal defendant in the course of the trial when he has not effectively waived his right to assistance of counsel, and the participation by an attorney when the defendant is proceeding pro se. *Id*. There is no absolute right to hybrid representation, and whether to allow hybrid representation lies in the discretion of the trial court. *Id*. at 563.

¶15. In the case *sub judice*, the trial judge explained to Henley that he was entitled to an effective lawyer, but not to the lawyer of his choice. The judge told Henley that he could proceed pro se and that he could participate in his trial by asking the witnesses questions and still have Mr. Prather present as advisor. Henley responded, "Absolutely, your Honor, absolutely."

¶16. Before court began the next morning, the trial judge again questioned Henley on whether he wanted to proceed *pro se*. Henley stated that he did not wish to represent himself, but he felt like he (Prather) was not acting in his best interest. Henley stated that if forced to represent himself, he would do the best he could. The trial judge replied that Henley was not being forced to represent himself and then inquired as to educational background. Henley answered that he had received approximately one year of college and attended trade schools and a theology seminary, but had no experience in the criminal justice system.

¶17. The trial judge found that he was not competent to represent himself. The judge then went into a lengthy explanation of the criminal justice system, the seriousness of the charges against Henley, the advantages of having a lawyer present, and some rules and procedures of the trial system. Henley then asked the judge if he could put Prather on the stand and ask him some questions. The judge said that he would not allow that, and Henley responded that he did not want Prather to represent him. Shortly thereafter, Henley restated his desire to proceed without Prather. The judge then allowed Henley to represent himself and ordered Prather to remain in the courtroom as an advisor.

¶18. Although the record indicates that Henley never waived his right to counsel, it is clear that he did not want to proceed with Prather as his counsel. Henley's desire was for the trial court to appoint another lawyer to represent him, which would have led to an extensive delay in Henley's trial.[4] Indigent criminal defendants, such as Henley, are not entitled to counsel of their own choosing, but only to reasonably effective assistance of counsel. *Johnson v. State*, 476 So.2d 1195, 1204 (Miss.1985).

¶19. Admittedly, Henley has the right to proceed without counsel and to refuse the representation of counsel appointed to him. *Curlee v. State*, 437 So.2d 1, 2 (Miss. 1983). However, Henley cannot use this right to play "cat and mouse" games with the court, nor can he "seek to place the trial judge in a position where, in moving along the business of the court, the judge appears to be arbitrarily depriving him of counsel." *Evans v. State*, 273 So.2d 495, 449 (Miss. 1973)*(quoting United States v. McMann*, 386 F.2d 611, 618-19 (2nd Cir. 1967)).

¶20. Like the defendant in *Metcalf*, Henley argues that he never effectively requested that he be allowed to represent himself. The record reveals that Henley expressed an absolute desire to conduct, at least part, of his own defense. Recognizing that Henley had not fully waived his right to counsel, the trial judge granted Henley's wish to participate in his trial, and ordered Prather to remain as standby or advisory counsel. In effect, Henley was afforded the type of "hybrid" representation that this Court has approved of previously. *See, e.g., Metcalf*, 629 So.2d at 564-65 and *Dunn v. State*, 693 So.2d 1333, 1341-43 (Miss. 1997). Henley questioned two of the State's witnesses, made his own closing argument, took the stand in his own defense, while Prather questioned him from a list of questions prepared by Henley, and participated in the jury instruction process.

¶21. The dissent asserts that the trial judge conducted "no real hearing and made no findings." As noted *supra*, the record belies this conclusion. The conversation between the judge and Henley covers seventeen pages in the record. On two separate occasions Henley was given ample opportunity to bring to the trial court's attention his complaints with Prather. Although not designated as a formal hearing, it is clear that Henley was afforded the equivalent of a hearing on his complaints. A fair reading of the record reveals Henley's dissatisfaction with Prather concerned the cross-examination of Fields rather than any personal conflict between the two. The trial court explicitly found that Prather was a competent lawyer and the record supports the determination that Prather was performing in a competent manner at this point in the trial. In fact, Henley even thanked Prather during his narrative given at the sentencing hearing.

¶22. Apparently the dissent would force the trial judge to put counsel on the stand and allow the defendant to question him. Not only is there no persuasive precedent for this position, but such a procedure would virtually put the trial court at the mercy of the defendant. Defendants throughout the state would immediately develop personal conflicts with their lawyers during the middle of trial in an effort to delay a possible unfavorable verdict and a stint in prison.

¶23. This assignment of error is without merit. The trial judge was confronted with a indigent defendant who, in the middle of trial, wanted counsel other than his appointed counsel, to represent him and who expressed a desire to conduct, at least part of, his own defense. With respect to a hearing, the trial judge afforded Henley more than ample opportunity to express his objections to continuing with Prather as his counsel. It is implicit that the trial judge found the personal conflict, assuming one existed, to have no bearing on Prather's ability to provide a competent defense for Henley. The trial judge opted to utilize the sort of "hybrid" representation that this Court has approved of on prior occasions. Under the circumstances, we cannot say that the trial judge abused his discretion in employing a "hybrid" representation in this case.

> II. THE CIRCUIT COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION FOR J.N.O.V. OR, ALTERNATIVELY, FOR A NEW TRIAL ON THE GRAND LARCENY COUNT OF THE INDICTMENT.

¶24. Henley argues that, since the State failed to put on any proof as to the value of the truck, this Court should reverse and render his conviction for grand larceny. The State, while admitting that no proof was offered as to the value of the truck, argues that Henley waived this issue when he failed to make a motion for a directed verdict.

¶25. Count I of the indictment charged Henley with stealing a 1985 red Dodge pick-up truck with a total value of over $250 belonging to Roger Dawkins. "Every person who shall be convicted of taking and carrying away, feloniously, the personal property of another, of the value of Two Hundred Fifty Dollars

($250.00) or more, shall be guilty of grand larceny." Miss. Code Ann. § 97-17-41(1)(1994).[(5)] At trial, there was no proof as to the value of the truck, or whether Henley had stolen a motor vehicle on a previous occasion. Without any evidence as to the value of the truck, the State has failed to meet its burden of proof as to one of the elements of grand larceny and conviction of same cannot be upheld.

¶26. The State's argument that Henley waived this assignment of error when he failed to move for a directed verdict at the close of the State's case is without merit. The record reveals that, after the State rested, the court asked Prather to advise Henley of any motions. After consulting with Prather, Henley, himself, moved the court to bring Fields back to the stand for more cross-examination and to subpoena several witnesses. Despite the insufficiency of the evidence, Henley failed to move for a directed verdict as to the count of grand larceny.

¶27. Henley did request a peremptory instruction and he raised the specific issue of lack of evidence on the value of the truck in his motion for J.N.O.V. or, alternatively, a new trial. The general rule is that a defendant who moves for a directed verdict at the close of the State's case-in-chief and then proceeds to present evidence in his own behalf, but fails to renew his motion for a directed verdict at the close of all the evidence, waives any assignment of error in the trial court's refusal to grant his directed verdict motion. *Warren v. State*, 709 So.2d 415, 418 (Miss. 1998). A defendant who offers evidence of his own does not waive the right to challenge the sufficiency or weight of the evidence in the event of an adverse jury verdict. *Wetz v. State,* 503 So.2d 803, 808 n.3 (Miss. 1987). Henley could raise the issue either at the close of the State's case-in-chief, at the close of the evidence, through a peremptory instruction, or in a motion for J.N.O.V. or new trial. *See Holland v. State*, 656 So.2d 1192, 1197 (Miss. 1995). Thus, this issue is properly before this Court.

¶28. Because there is simply no evidence in the record as to the value of the truck, Henley's conviction for grand larceny cannot stand. However, petit larceny is a lesser included offense of grand larceny. *See* Miss. Code Ann. § 97-17-43 (1994). This Court has a long line of cases employing the direct remand rule, which does not require a new trial but merely remands to the lower court for sentencing of the lesser included offense. *See generally Yates v. State*, 685 So.2d 715, 720-21 (Miss. 1996); *Alford v. State*, 656 So.2d 1186 (Miss. 1995); *Clemons v. State*, 473 So.2d 943 (Miss. 1985); *Biles v. State*, 338 So.2d 1004 (Miss. 1976).

¶29. In the case *sub judice*, Henley admitted to taking the truck and driving it to Bartlett, Tennessee. Guided by our previous cases and finding the evidence sufficient to support a conviction of petit larceny, Henley's conviction of grand larceny is reversed and this case is remanded to the lower court for sentencing on the charge of petit larceny.

### III. THE CIRCUIT COURT ERRED IN DISALLOWING THE DEFENDANT'S CHALLENGE TO VENIRE PANELIST NUMBER 19.

¶30. On review, the trial court's determinations under *See Batson* are afforded great deference because they are, in large part, based on credibility. *Coleman v. State*, 697 So.2d 777, 785 (Miss. 1997). This Court will not reverse any factual findings relating to a *Batson* challenge unless they are clearly erroneous. *Id*.

¶31. A party's peremptory challenge must pass constitutional muster. *Batson v. Kentucky*, 476 U.S. 79 (1986). *Batson* protection has since been extended to civil trials, to strikes exercised by the defense, and

to discriminatory strikes based on gender. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 631 (1991) (*Batson* extended to civil context); *Georgia v. McCollum*, 505 U.S. 42, 59 (1992) (extending *Batson* to strikes exercised by criminal defendant); *J.E.B. v. Alabama*, 511 U.S. 127, 141 (1994) (applying *Batson* to gender).

¶32. To determine whether a party improperly used a peremptory challenge to discriminate against a potential juror, the objecting party [opponent] must first make a *prima facie* showing of discrimination that race was the criteria for the exercise of challenge. *Stewart v. State*, 662 So.2d 552, 557-58 (Miss. 1995) . The burden then shifts to the party exercising the challenge [proponent] to offer a nondiscriminatory reason for its strike. *Id*. It is then left to the trial court to determine whether the objecting party has met its burden to prove there has been purposeful discrimination in exercise of the challenge. *Id*. We consider each prong of the *Batson* test separately.

A. The Prima Facie Case

¶33. Traditionally, a *prima facie* showing of discrimination required that the opponent of the strike show:

1. That he is a member of a "cognizable racial group";

2. That the proponent has exercised peremptory challenges toward the elimination of veniremen of his race; and

3. That facts and circumstances raised an inference that the proponent used his peremptory challenges for the purpose of striking minorities.

*Batson*, 476 U.S. at 96.

¶34. This test has been modified somewhat by the Supreme Court's decision in *Powers v. Ohio*, 499 U.S. 400 (1991). There, the Court held that Powers, a white, had standing to challenge the exclusion of black jurors on the grounds that the equal protection right of the juror to serve was protected by *Batson*. *Powers*, 499 U.S. at 406. Essentially, this means that step three above becomes the pivotal inquiry to determine a *prima facie* case. See *Davis v. State*, 660 So.2d 1228, 1240 (Miss. 1995). The decisive question is whether the opponent of the strike has met the burden of showing that the proponent has engaged in a pattern of strikes based on race or gender, or in other words "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94.

¶35. The State made a reverse *Batson* challenge due to the fact that Henley had used his first three peremptory challenges to strike three white females. This Court has examined the number of strikes on a particular class, the ultimate ethnic or gender makeup of the jury, the nature of questions asked during voir dire, and the overall demeanor of the attorney. See *Coleman v. State*, 697 So.2d 777, 786 (Miss. 1997); *Davis*, 660 So.2d at 1263 (Banks, J., concurring); *Mack v. State*, 650 So.2d 1289, 1299 (Miss. 1994), cert. denied, 516 U.S. 880 (1995). "[T]he [opponent of the strike] is entitled to rely on the fact,... that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate'." *Batson*, 476 U.S. at 96 (citation omitted); *Simon v. State*, 688 So.2d 791, 808 (Miss. 1997).

¶36. Courts, including this one, have recognized that such factual intensive inquiries give rise to a highly deferential standard of review. *Batson*, 476 U.S. at 98 n. 21; *Collins v. State*, 691 So.2d 918, 926

(Miss. 1997); *Davis*, 660 So.2d at 1242. Traveling under this deferential standard, it is clear that the judge was within his discretion in determining that a *prima facie* case of discrimination existed.

## B. Gender and Racial Neutral Explanations

¶37. All that is required here is that the proponent of the strike give race or gender neutral reasons for the strike. *Batson*, 476 U.S. at 97. Any reason which is not facially violative of equal protection will suffice. *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995). Henley's gender and race neutral explanations for striking panelist #19 was that she was a housewife and unemployed. Additionally, he felt that she could not be fair and impartial, but was unable to give specific reasons because the information was received in confidence. While being a housewife is by its definition not gender neutral, Henley's other reasons are not facially violative of equal protection, and thus they pass the second prong of the *Batson* analysis. However, the teachings of *Purkett* make clear that a facially neutral reason under step two is not necessarily a non-pretextual one under step three.

## C. Pretext

¶38. This prong requires that the trial court determine if the opponent of the strike has carried his overall burden of proving purposeful discrimination. Primarily, this determination will turn on whether the proponent's proffered reasons are pretextual. The court will examine the reasons given by the proponent; and, as explained in *Purkett*, "at that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.

¶39. Determination of pretext involves an analysis of factual findings which are similar to those found under step one: the extent and nature of voir dire on the grounds upon which the strike is being exercised;[(6)] the relation between the reasons for the strike and the facts of the case;[(7)] the demeanor of the attorney and the prospective juror;[(8)] and, disparate impact upon a minority or gender class.[(9)]

¶40. The term housewife necessarily limits the class to females. This is not a gender neutral reason and can be dismissed. This Court has previously held that unemployment is a valid, racially neutral reason for striking a potential juror. *See, e.g., Mack*, 650 So.2d at 1299. The trial judge did not state his reasons for seeing this explanation as pretextual. Nor, did he say that the reason was pretextual; we infer pretext because the trial judge disallowed the challenge when Prather would not state additional reasons into the record. Apparently, the trial court focused on the fact that Prather would not state his additional reasons into the record, which implies that the court regarded unemployment as a pretext for purposeful discrimination.

¶41. In *Mack*, we recognized that the stronger the *prima facie* case, the more cogent the explanations from the proponent and supporting evidence must be and vice versa. *Mack*, 650 So.2d at 1298. In other words, the relative strength of the *prima facie* case of purposeful discrimination established at step one will often directly color the inquiry into whether any given reason is mere pretext. *Id*. These determinations fall squarely within the province and expertise of the trial judge, who will not be reversed except upon a showing of clear error. *Batson*, 476 U.S. at 98 n. 21; *Collins*, 691 So.2d at 926; *Davis*, 660 So.2d at 1242. Viewing the record as a whole, we cannot say that the trial judge was clearly erroneous in disallowing Henley's peremptory challenge of #19. The State made a reverse *Batson* challenge based on the fact that Henley had used his first three strikes on three white female jurors. At least one of Henley's proffered reasons, that #19 was a housewife, was not gender neutral. The trial judge had the opportunity to judge the demeanor of the attorney making the proffer and examine his reasons while observing the

attorney. While unemployment is facially neutral, it is apparent that the trial judge viewed this reason as a pretext for purposeful discrimination. When Henley failed to give additional reasons for his challenge, the trial judge declined to accept unemployment as a nondiscriminatory reason. Under the facts contained in the record before us, we cannot say that this determination was clearly erroneous.

### IV. ATTORNEY ROBERT PRATHER PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL TO THE DEFENDANT AND THIS INEFFECTIVE REPRESENTATION SERIOUSLY PREJUDICED HAROLD HENELY'S DEFENSE.

¶42. In his fourth issue on appeal, Henley alleges he received ineffective assistance of counsel from his court appointed attorney, Robert Prather. Specifically, Henley complains that Prather was hostile towards him, hung up on him, would not accept his collect telephone calls, and spent less than 10 minutes with him before trial. The State responds that the record is insufficient to make a finding of ineffective assistance of counsel, and that Henley has failed to satisfy either prong of the *Strickland* test.

¶43. To prove a claim of ineffective assistance of counsel, Henley must show that counsel's performance was deficient and that his defense was prejudiced by the deficient performance. *Walker v. State*, 703 So.2d 266, 268 (Miss. 1997); *see also Strickland v. Washington*, 466 U.S. 688, 694 (1984). This Court presumes trial counsel to be competent for the purposes of ineffective assistance of counsel claim. *Brooks v. State*, 573 So.2d 1350, 1353 (Miss. 1990). In order to overcome this presumption, Henley must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of his trial would have been different. *Drennan v. State*, 695 So.2d 581, 586 (Miss. 1997) *(quoting Schmitt v. State*, 56 So.2d 148, 154 (Miss.1990)). This Court views counsel's performance under the totality of circumstances. *Cole v. State*, 666 So.2d 767, 775 (Miss. 1995). "[T]he level of scrutiny to be applied when measuring the performance of counsel against the deficiency and prejudicial prongs of *Strickland* is to look at the `over all' performance." *Taylor v. State*, 682 So.2d 359, 363 (Miss. 1996).

¶44. After careful review of the record, we find that Henley has failed to satisfy either prong of the *Strickland*. Up until the point where Henley took over his own defense and Prather assumed an advisory role, the record reveals that Prather performed in a competent manner. Prather conducted voir dire of the jury panel, made a *Batson* challenge to the State's strikes, and responded to the State's reverse *Batson* challenges. During the course of trial, Prather's performance was also adequate. He conducted the cross-examination of six of the State's witnesses, made numerous objections to the testimony of the State's witnesses, as well as to exhibits offered into evidence, and moved to dismiss because of an alleged discovery violation by the State.

¶45. After Henley took over his own defense and Prather was ordered to remain as his advisor, the record reveals that Prather conferred with and offered advice to Henley as to how he should proceed. Prather advised Henley on the objections to the State's attempt to impeach him with a prior conviction. After Henley said he was finished with cross- examination of Trace French, an investigator who searched Henley's home pursuant to search warrant, Prather asked the judge if could he confer with Henley. After conferring with Prather, Henley continued the cross-examination of French and was able to elicit the fact that the police found drug paraphernalia in the home, which they failed to take as evidence. This was an important point, since Henley alleged that Fields had agreed to have sex with him if he would give her some crack to smoke. Prather also conducted the direct examination of Henley and participated in the jury instruction phase.

¶46. The only possible deficiency in Prather's performance occurred when he failed to move for a directed verdict on the count of grand larceny. At this point in the trial, Henley had taken over the role of counsel in his own defense. Prather was relegated to the role of an advisor. After the State rested, Henley and Prather did confer as to what, if any, motions should be made. Henley moved the court to bring Fields back to the stand and to subpoena various witnesses to testify in his defense. In fact, the court asked Henley if he wanted Prather to make the motion for him and Henley said, "No, sir."

¶47. Prather's failure to move for a directed verdict as to the grand larceny charge would render his performance deficient under the *Strickland* test. *See Holland*, 656 So.2d at 1198. However, since we have reversed Henley's conviction of grand larceny, the issue is now moot.

## CONCLUSION

¶48. Since the State failed to offer any evidence as to the value of the truck, Henley's conviction for grand larceny cannot stand. The grand larceny conviction is reversed and remanded to the lower court for sentencing on petit larceny. The remainder of Henley's arguments are without merit and his conviction is affirmed as to those issues.

¶49. **COUNT I: CONVICTION OF GRAND LARCENY AND SENTENCE OF 5 YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, REVERSED AND REMANDED FOR RESENTENCING FOR THE LESSER OFFENSE OF PETIT LARCENY. COUNT II: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF 18 YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, TO RUN CONCURRENTLY WITH COUNT III, AFFIRMED. COUNT III: CONVICTION OF ATTEMPTED RAPE AND SENTENCE OF 8 YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, TO RUN CONCURRENTLY WITH COUNT II, AFFIRMED.**

**SULLIVAN AND PITTMAN, P.JJ., McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR. BANKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION. PRATHER, C.J., NOT PARTICIPATING.**

**BANKS, JUSTICE, DISSENTING:**

¶50. Because it is my view that the trial court failed in its duty to fully explore the difficulty between client and counsel before forcing the defendant to proceed pro se, I must dissent.

¶51. While it true that an indigent defendant is not afforded a choice of state funded counsel by our constitutions it is equally true that where there are substantial grounds such a defendant may be entitled to have appointed counsel replaced. *See People v. Ginther*, 212 N. W. 2d 922, 924 (Mich. 1973) (citing American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Providing Defense Services, S. 5.3). Moreover, when a substantial conflict between counsel and defendant is asserted, it is incumbent upon the trial court to fully explore the reasons for the conflict. *Id*.; *State v. Fender*, 484 N. W. 2d 307, 309-10 (S.D. 1992); *State v. Kane*, 479 P. 2d 207, 210 (Haw. 1971)

("Procedural due process requires (1) that a defendant have an opportunity to state on the record the basis for his objections to appointed counsel and (2) that a determination be made by the trial court as to the merits of these objections."); *People v. Bass,* 279 N. W. 2d 551, 555 (Mich. Ct. App. 1979).

¶52. In the instant case, Henley sought to speak to the court and his attorney said "no" more than once. When Henley was asked to approach the bench by the court and his attorney was also invited, the attorney at first declined to come but the court insisted. After the jury was excused, Henley alleged that his attorney had spent no more than ten minutes in the aggregate consulting with him about his case prior to trial, and that the attorney had refused to accept numerous calls and had hung up on him on occasion. He felt that his attorney was hostile towards him. He also expressed specific disagreement with the manner of his attorney's cross-examination of the complaining witness.

¶53. Summarizing what followed, the trial court immediately gave Henley the choice of continuing with the attorney or proceeding *pro se.* Henley repeatedly said that he did not wish to proceed *pro se* but that he would if compelled to do so. The prosecutor volunteered that defense counsel had been diligent in trying to work out a plea bargain. Henley's attempted response to that assertion was cut-off by the court. The court noted that the attorney was experienced, competent and respected. When asked for a response defense counsel asked the court that Henley be allowed to represent himself and moved to withdraw. He did not respond to the specific allegations made by Henley. The motion to allow Henley to represent himself was granted but the motion to withdraw was denied. The court persisted in the solution that Henley proceed *pro se* and directed that defense counsel serve as stand-by counsel in an advisory capacity only.[10]

¶54. After a recess, the court[11] examined Henley concerning his abilities in relation to proceeding *pro se.* Henley continued to express his desire for counsel. He asked that he be allowed to propound some questions to defense counsel, apparently on the issue of the conflict between them. The court, on its own motion, declined the request. At the end of this colloquy, defense counsel was offered the opportunity to put any further matters into the record. He stated that he had represented Henley to the best of his ability and that he had advised him that proceeding pro se was not in his best interest. He responded to the specific allegations only by acknowledging that he had indeed hung up on the defendant on an occasion when the defendant called him at home. He stated that he had been in the shower and that he had a policy against accepting calls at home. No explanation or refutation was made concerning Henley's other concerns. Henley then proceeded *pro se* as the majority describes.

¶55. Henley's complaint about the cross-examination of the complaining witness finds little support in this record. The fact is, however, the exact nature of his objection was never fully explored. It is also true that Henley's complaint came somewhat late. It was in the middle of trial after a number of witnesses had testified. Presumably Henley was well aware of any inadequacy of pre-trial discussion well before that time.

¶56. That said, however, we labor in total ignorance of what actually occurred between counsel and client which prompted Henley's request. The court conducted no real hearing and made no findings. For that reason I would remand this matter to that court for a hearing on this issue to determine the full import of the conflict alleged. I recognize that full exposition of the facts may be impossible due to the death of the defense counsel during the pendency of this appeal. Nevertheless, it is my view that remand is the least that is required to appropriately address the failure of the trial court to fully explore the circumstances of the issue with which it was confronted at trial before requiring the defendant to proceed pro se.

1. The electricity to the home had been cut-off before the events in question.

2. Apparently, Fields' clothing was removed by one of the first officers on the scene the night of the attack. Henley admitted that Fields left his house without any clothes on.

3. Mr. Prather was court appointed to represent Henley, who is indigent.

4. At this point in the trial, the State had two witnesses left in its case-in-chief, Henley was the only defense witness, and the State offered no rebuttal.

5. 97-17-42, which makes the taking of a motor vehicle, without authority, a felony was not effective until two months after Henley's crime.

6. *J.E.B. v. Alabama*, 511 U.S. at 143-44; *Jackson v. State*, 684 So.2d 1213, 1223 (Miss. 1996); *Stewart v. State*, 662 So.2d 552, 559 (Miss. 1995); *Hatten v. State*, 628 So.2d 294, 305 (Miss. 1993) (Hawkins, C.J., specially concurring); *Mack v. State*, 650 So.2d 1289, 1299 (Miss. 1994).

7. *Mack*, 650 So.2d at 1298 (citations omitted); *Batson*, 476 U.S. at 89; *Hatten*, 628 So.2d at 300 (Hawkins, C.J., specially concurring); *Purkett*, 514 U.S. at 768-69; *Blue v. State* 674 So.2d 1184, 1211 (Miss. 1996); *Lockett v. State*, 517 So.2d 1346, 1348 (Miss. 1987).

8. *Hernandez*, 500 U.S. at 365; *Lockett*, 517 So.2d at 1352; *Mack*, 650 So.2d at 1299; *Stewart*, 662 So.2d at 559; *Walker v. State*, 671 So.2d 581 (Miss. 1995).

9. *Batson*, 476 U.S. at 94; *Davis*, 660 So.2d at 1264 (Banks, J., concurring); *Hatten*, 628 So.2d at 303 (Hawkins, C.J., specially concurring); *Mack*, 650 So.2d at 1298.

10. In order to present the proceedings here at issue in context a copy of the relevant transcript pages are attached as an appendix to this opinion.

11. The majority suggests that propounding questions to defense counsel somehow puts the court at defendant's mercy. I fail to see how allowing trained counsel to respond to questions from a pro se defendant concerning the relationship between them in any way puts a competent court at the defendant's mercy. On the contrary, a defendant who finds himself in such circumstances is really at the mercy of the trained professionals involved including the court, the prosecutor and defense counsel.