# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-00430-COA

**PATRICK EVANS CLARK A/K/A PATRICK E.**          **APPELLANT**
**CLARK A/K/A PATRICK CLARK**

**v.**

**STATE OF MISSISSIPPI**          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/03/2015 |
| TRIAL JUDGE: | HON. JAMES MCCLURE III |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF CAPITAL MURDER AND SENTENCED TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE |
| DISPOSITION: | AFFIRMED – 03/07/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., FAIR AND WILSON, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1. On February 24, 2015, a jury in the Circuit Court of Panola County, First Judicial District, convicted Patrick Evans Clark of the capital murder of Charlene Wren (Wren) and sentenced him as a habitual offender to life imprisonment without the possibility of parole. Aggrieved, Clark appeals and presents multiple issues—both through counsel and pro se—for this Court's resolution. For the sake of clarity and efficiency, we have edited the

issues as follows:

A.   Issues Raised by Clark's Counsel:

1.   Whether the trial court erred in requiring Clark to respond to cross-examination questions about a statement that had been excluded by pretrial order;

2.   Whether Clark's trial counsel was constitutionally ineffective; and

3.   Whether the trial court erred in refusing to allow Clark to be recalled as a witness.

B.   Issues Raised by Clark, Pro Se:

1.   Whether the trial judge erred in requiring him to wear an electronic restraint at trial;

2.   Whether the trial court violated his right to confront the witnesses against him in allowing the coroner['s] medical-examiner investigator to testify as to the state medical examiner's autopsy report;

3.   Whether his right against double jeopardy was violated in allowing him to be convicted and sentenced a second time and in allowing the State to prove that he was a habitual offender for a second time;

4.   Whether the State failed to prove that he was a habitual offender;

5.   Whether he was denied his right to confidential communications with his attorney;

6.   Whether the trial judge erred in allowing questioning as to his "Letter Confession";

7.   Whether the trial judge erred in denying his motion to dismiss the indictment;

2

8. Whether the trial court erred in allowing witness testimony regarding "immaterial, irrelevant, and highly prejudicial" facts not in evidence;

9. Whether the trial judge erred in denying his motion for a change of venue; and

10. Whether the trial judge denied him his right to proceed pro se.

¶2. Finding no reversible error, we affirm Clark's conviction and sentence.

FACTS

¶3. Clark and Wren, both residents of Panola County, Mississippi, were involved in an on-again, off-again romantic relationship for approximately two years. Clark and Wren broke up a final time on August 26, 1998, at which time Wren was living with her twenty-three-year-old son, Tony, in a trailer located on property owned by Wren's mother. Clark testified at trial that he had also been living at Wren's trailer for about seven months prior to August 26, 1998, and that Wren had given him a key to the trailer. Clark testified that the relationship ultimately broke apart because Wren's mother and three sisters—who also lived on the property in a house next door to the trailer—demanded that Wren ask Clark to leave the property or else they would both be forced to leave. Tony, Wren's mother, and one of Wren's sisters contradicted Clark's testimony at trial, maintaining that Tony and Wren were the only two persons living at Wren's trailer in the seven months prior to August 26, 1998. Tony further testified that while Clark might occasionally spend a couple of nights at the trailer, he neither resided there nor owned a key.

3

¶4.    On the evening of August 26, 1998, Clark went to Wren's trailer to remove his personal property.  The witnesses differed in their accounts of what occurred in the nighttime hours between August 26, 1998, and August 27, 1998, during which Wren was shot and killed.  Tony testified that around 12 midnight or 12:30 a.m., Clark called the trailer's home phone twice and asked to speak to Wren.  Tony answered and told Clark that his mother was asleep.  Shortly after, Clark drove his truck to Wren's trailer.  Tony was standing in the driveway when Clark arrived.  Clark asked Tony whether Wren was seeing anyone else, to which Tony replied that she was not.  Clark then left.  Tony went inside the trailer, locked the door—including the deadbolt—went to his bedroom, and got in bed.

¶5.    Around 1:30 a.m., Clark again called the trailer's home phone and requested to speak to Wren.  Again, Tony answered and told Clark that his mother was asleep.  About an hour later, Tony heard a truck pull up in the yard.  Someone exited the truck and began knocking on the door.  Tony got out of bed and looked out to see Clark walking off the trailer's porch, headed away from the door and back toward his truck.  Tony thought Clark was leaving, so he lay down on the couch, which was located "right in front of the door" on which Clark had been knocking.  The knocking suddenly resumed, but Tony, assuming that Clark had returned and would eventually leave, ignored it and stayed on the couch.  Tony testified that the following then took place:

> [TONY]: . . . Next thing I know I heard the screen door snatch open and the front door come flying open[;] he had kicked the door in.
>
> [THE PROSECUTOR]: Was - - did he have a key to the house?

4

[TONY]: No, sir.  He didn't.

[THE PROSECUTOR]: Did he force his way in?

[TONY]: Yes, sir.  He did.

[THE PROSECUTOR]: You said he kicked the door open[;] what about the deadbolt?

[TONY]: He kicked that in[;] the door flew in.

[THE PROSECUTOR]: Did he break the door?

[TONY]: Yes, sir.  He broke the door.

Upon kicking in the door, Clark used his shoulder and back to force his way into the trailer. Tony testified that Clark was holding a twelve-gauge shotgun when he came through the doorway.  Because Clark had forced his way in with his back to the trailer's interior, he did not immediately see Tony lying on the couch.  Clark began heading toward Wren's bedroom; when he reached the kitchen—located about fifteen feet from the couch on which Tony was lying—Tony jumped up and yelled to warn his mother.  Upon hearing Tony and noticing that he was in the room, Clark turned, cocked the gun, and shot at Tony; however, Clark missed Tony and instead shot the floor model television stand located by the door through which he had entered.  Tony immediately ran out of the trailer to get help.  As he was jumping off of the porch, he heard another two shots fired from inside the trailer.  Tony testified that when he obtained help and finally returned to the trailer, he found his mother on the floor, dying from a gunshot wound to the chest.

5

¶6. At trial, Clark's account of these events differed greatly from Tony's. Clark testified that around 11:30 p.m. or midnight on August 26, 1998, he went to Wren's trailer to collect the last of his property, which he had been moving all evening. He testified that when he pulled up to the trailer, Tony was standing in the driveway, holding a cordless phone. Clark maintained that he saw Tony call Wren[1] and warn her that Clark was in the driveway, which he deemed suspicious, but he proceeded to head toward the trailer anyway. Clark testified that he used his own key to open the trailer door; however, immediately upon entering the trailer, he saw a "naked man[2] just with his clothes in his arm" run out the back door. According to Clark, Wren then appeared "with her little pink gown on, got a bath towel stuck between her legs trying to convince me that she wasn't doing anything." Although angered by what he had seen, Clark said he exited the trailer and returned to his truck. When he reached the truck, he saw Tony standing there, "looking crazy, steady [sic] fumbling with his shirt like he had something." Feeling uncomfortable, Clark left the house, stopped at a convenience store, and called Wren twice on her home phone. According to Clark, Wren answered both times, and the two argued. Clark testified that he wanted to get the remainder of his property from Wren's trailer, but he was afraid to return because all of his firearms were in the trailer, and he felt that both Tony and the unidentified naked man posed a threat

---

[1] Clark asserts that Tony hit a button on the cordless phone, which made the home phone in the trailer ring.

[2] Clark testified at trial that he could not identify the man because he only saw the man's back side.

6

to him. Thus, Clark went to his mother's house and "got a couple of guns," to take with him to the trailer, "[n]ot to hurt anybody with," but to ensure his own protection "because [he] didn't know what to expect."

¶7.    Clark testified that he returned to Wren's trailer around 1:30 a.m. or 2:00 a.m. on the morning of August 27, 1998. He drove up, exited his truck, went to the door of the trailer, and knocked for several minutes. When no one answered, he went to the side of the trailer and knocked on the air-conditioning unit in the window of Wren's bedroom. Again, no one answered, so he went back to his truck and got his key to Wren's trailer. Clark testified that he "went back and opened the door to the [trailer]," and "went in the [trailer]" using his key. He denied ever having kicked in the trailer door. Further, he maintained that he "did not go in that house with a gun in [his] hand"; rather, according to him, he left the recently obtained guns in his truck. Clark testified that only after he entered the trailer did he become armed: he grabbed the gun that he always kept behind the TV stand that was located right next to the door. Clark stated that he never intended to hurt anyone with the gun; rather, he was just retrieving it from the trailer, along with the rest of his personal property.

¶8.    Clark testified that he did not see anyone in the trailer at the time that he entered. He testified that he walked into the kitchen to retrieve his microwave and deep freezer, and that as he bent over to unplug the deep freezer, he was hit in the head with a crystal ashtray. According to Clark, he turned and saw Tony standing several feet away with another ashtray in his hand. Clark testified that he grabbed the gun from his shoulder, but it accidentally

7

discharged and shot the TV stand. At this point, Tony ran out of the trailer. Clark testified that he began trying to unload the gun when Wren suddenly appeared from her bedroom—about twelve to fifteen feet from where Clark was standing—cursing and screaming. Clark testified that Wren was standing with one hand on the doorknob to her bedroom and the other hand holding a "rather small gun," which Clark speculated to be a revolver. Clark said that at that time, the following took place:

> She raised the gun up, [and] scared me[;] I'm just trying to get out of her way, but instinctively I just threw the gun up and I fired the gun and I went out the door. I was yelling back in the house at her, "Sit down somewhere. All I want to do is get my stuff." She never responded to me, so I was afraid to go back in the house. . . . I don't know where Tony [is] at, you know, I don't know what's out there. And all of her family members live right around in the same little area.

When asked for more details regarding how he shot Wren, Clark maintained that it was an accident:

> After the gun went off and fired and hit the TV, I was in the process of unloading the gun and this is when she just bust [sic] out on me. So just by instinct when I turned around and I saw her [screaming], ". . . I'm going to kill you. I'm going to kill you . . . ." It was just my instincts to throw up - - to throw the gun up[;] I just threw the gun up and I fired it. I never tried to kill Ms. Wren. I never had the intent to hurt [anybody], you know, but the incident did happen.
>
> [DEFENSE COUNSEL]: When you say you threw the gun up you mean you threw it - -
>
> [CLARK]: I just threw it up over my shoulder. [I was] getting out of her way, out of her path. Just [instinctively,] I threw the gun up and fired the gun.
>
> [DEFENSE COUNSEL]: So when you shot[,] Ms. Wren was behind you?

8

[CLARK]: Yes.

[DEFENSE COUNSEL]: Okay. And you ran out of the house after that?

[CLARK]: Right.

Clark testified that after running out of the trailer, he heard more gunshots coming from inside:

> I called for Tony a couple of times but nobody responded. Then I heard two to three gunshots. By the gun being fired in the house[,] my ears [were] ringing[;] I actually can't hear too [well], so [I was] looking to where the gunshot [was] coming from. I never [saw] any flashes. So this spooked me. So I feel like it was in my best interest to leave then and this is why I got in my truck and I left.

¶9. Clark testified that he knew the police were probably looking for him, so he drove to Senatobia and threw the guns he had brought with him from his mother's house out of the truck. However, he hid the gun used in the shooting under the hood of his truck. Sometime later on August 27, 1998, Clark was apprehended by the police and arrested.

¶10. Upon his arrest, Clark was immediately interviewed by Panola County Sheriff's Department Investigator Craig Sheley and Mississippi Bureau of Investigation Investigator Walter Davis. The interview was audio recorded; however, large portions of the tape were later deemed inaudible by the trial court. Days later, on September 2, 1998, Clark was interviewed by Panola County Sheriff David Bryan, now deceased.

¶11. On November 19, 1998, a Panola County grand jury indicted Clark, as a habitual

9

offender,[3] for burglary, grand larceny, and the capital murder of Wren. The charges of burglary and grand larceny were remanded to the files. On February 12, 1999, Clark pleaded guilty to the capital-murder charge and was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. While incarcerated, Clark filed three petitions for post-conviction relief (PCR), the third of which sought to have his indictment quashed and dismissed on the basis that it was defective. On May 29, 2012, the trial court granted Clark's motion and entered an order and judgment quashing and dismissing the indictment. The court vacated and set aside Clark's conviction and sentence for capital murder.

¶12. On August 1, 2012, a Panola County grand jury indicted Clark a second time for burglary, grand larceny, and capital murder as a habitual offender. As before, the charges of burglary and grand larceny were remanded to the files. Between his second indictment and trial on February 23-24, 2015, Clark filed a litany of motions, both through counsel and pro se. Clark's counsel[4] filed the following motions: (1) a motion to dismiss the indictment on the basis that it constituted double jeopardy; (2) a motion for change of venue; (3) a motion for Clark to undergo a psychiatric examination; (4) a motion to suppress Clark's statement; (5) a motion to sever the counts in the indictment; (6) a motion in limine to prevent the elicitation or introduction of testimony or evidence as to Clark's felony

---

[3] Clark had previously been convicted of sexual battery on March 1, 1993, and of robbery on March 2, 1993.

[4] Throughout the course of this litigation, Clark was represented by two separate attorneys. Prior to trial, Clark's first attorney withdrew and he was appointed another attorney. To simplify matters, we refer to both attorneys generally as Clark's counsel.

convictions; (7) a motion in limine to exclude or limit photographic evidence and the autopsy report; (8) a motion in limine to exclude Clark's audio-recorded interview with Investigators Davis and Sheley because the recording was inaudible; and (9) a motion in limine to exclude Clark's audio-recorded interview with Sheriff Bryan because he had expired after Clark gave the interview. Of these motions, the following were granted: the motion to prevent the elicitation or introduction of testimony or evidence as to Clark's felony convictions; the motion to exclude Clark's audio-recorded interview with Investigators Davis and Sheley; and the motion to exclude Clark's audio-recorded interview with Sheriff Bryan.

¶13. In addition to the above motions filed by counsel, Clark filed the following motions, pro se: (1) a motion requesting to proceed pro se; (2) a motion to compel additional discovery and sanctions; (3) a motion to dismiss the indictment; (4) a "Petition of Notice," alleging that the prosecutor and a staff member wrongfully examined his defense file; and (5) a motion for the trial judge to recuse himself. The court issued an "Order Denying Defendant's Motions," which remarked on Clark's motion requesting to proceed pro se and motion to compel additional discovery,[5] and denied Clark's motion to dismiss the indictment and "Petition of Notice." During a pretrial hearing, Clark presented evidence as to why the

---

[5] The court actually granted Clark's motion to proceed pro se, but Clark later changed his mind and told the court that he wished to be represented by counsel at trial. The court also appears to have partially granted Clark's motion to compel additional discovery and sanctions, as it made the evidence that Clark was requesting available to him and scheduled a meeting for review of that evidence.

trial judge should recuse himself, and the court denied his motion.[6]

¶14.    Clark's trial lasted from February 23 to February 24, 2015; a jury found him guilty and convicted him of capital murder. The trial judge sentenced Clark, as a violent habitual offender, to a term of life imprisonment without the possibility of parole. Shortly thereafter, Clark filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, which was denied. Clark timely filed his notice of appeal on March 4, 2015, and now asserts multiple issues in briefs filed both by his counsel and himself. Additional facts, if necessary, will be related during our discussion of the issues.

## DISCUSSION

### A.    Issues Raised by Clark's Counsel

   1.    *Whether the trial court erred in requiring Clark to respond to cross-examination questions about a statement that had been excluded by pretrial order*

¶15.    Prior to trial, Clark filed two motions in limine to exclude audio recordings of the two interviews taken by Investigators Sheley and Davis and by the now-deceased Sheriff Bryan. The trial court granted both motions. At Clark's trial, Investigator Sheley testified as to the interview that he and Investigator Davis conducted with Clark on August 27, 1998. Investigator Sheley maintained that Clark, in his own words, told the investigators that he went to Wren's trailer, tried to get in but could not, so he "went back to the truck, got his

---

[6] Also of note is the fact that Clark successfully moved for a judge to recuse himself from Clark's case prior to the current motion for recusal at issue.

shotgun, went back [and] forced his way into the residence," at which point he shot at Tony and ultimately shot and killed Wren. During direct examination of Clark, his counsel asked him about Investigator Sheley's testimony. Clark responded, "Those are Mr. Sheley's words. They are not my words. I gave him a tape recorded statement; now, the jury can listen to this tape recorded statement, but I never signed that statement that . . . Mr. Sheley was referring to."

¶16. Upon cross-examination of Clark, the State acknowledged that Clark gave two separate interviews—one to Investigators Sheley and Davis and one to the late Sheriff Bryan. Then, the State asked Clark about the door to Wren's trailer, which Clark had denied kicking in during his direct examination:

> [STATE]: Well how did the door get kicked in?
>
> [CLARK]: Why don't you let the jury listen to the tape. Let the jury listen to the tape.
>
> [STATE]: Well, let me ask you this - -
>
> [CLARK]: Wait a minute. . . . Let them listen to the tape and that will clear all of this up.
>
> [STATE]: You know why? Because you asked the jury not be able to hear the tape and we agreed to it.
>
> &ast; &ast; &ast; &ast;
>
> [STATE]: We agreed to [exclusion of the tape], now you want to have the jury - - you want to use that against us because we agreed to it. Listen to the tape? You know the tape is inaudible, that's why you didn't want to hear it.
>
> [CLARK]: The tape is inaudible?

13

[STATE]: Yeah.

Clark then exclaimed that the prosecution sought to keep the tape from the jury in an attempt to "railroad" him. At this point, the trial judge intervened. The prosecutor asked the trial judge to allow him to question Clark regarding the interview with Sheriff Bryan, maintaining that it was proper since Clark had "opened the door":

> [STATE]: . . . I would like to ask him a question about [the tape]. He's brought this up and I think it's fair for me to be able to ask him about the other tape that we could not play because David is deceased, Sheriff Bryan is deceased. And that's the tape, I think, he's talking about. The rules of evidence as we all know would not allow us to play that because we couldn't produce the person that took the tape.
>
> [COURT]: All right, go ahead.
>
> [STATE]: But he's brought this in and I think it is right now.

The prosecution proceeded with its questioning and the following conversation transpired:

> [STATE]: Do you remember talking to Sheriff Bryan?
>
> [CLARK]: Yes, I do.
>
> [STATE]: Do you remember it being recorded?
>
> [CLARK]: No, I don't.
>
> [STATE]: Well it was recorded.
>
> [CLARK]: Well.
>
> [STATE]: Okay.

At this point, Clark's counsel objected on the basis that "[t]he Court has already kept [the

14

taped interview] out." The trial court overruled the objection, stating, "your client is the one who brought up the tape and opened the door." Clark interjected, "Your Honor, I'm not talking about that tape." The trial court admonished Clark for speaking without being prompted and allowed the prosecution to proceed with its questioning:

> [STATE]: All right. Do you remember the recording that you gave to Sheriff Bryan?
>
> [CLARK]: Yeah, I remember talking to Sheriff Bryan.
>
> * * * *
>
> [STATE]: And you got a copy of it in discovery; we gave you a copy of it; that's the transcript you're talking about, right?
>
> [CLARK]: Okay.
>
> [STATE]: And in there [Sheriff Bryan] said, "Did you have the gun in your hand when you went in that house?" And your response was, "Yes."
>
> [CLARK]: I don't recall any response to that. I have a right to confront my accusers; Sheriff Bryan is dead. The law requires that this not be brought in, but if you want to bring it in, . . . you want to violate my constitutional rights to confrontation, man, go ahead on and do so.
>
> [STATE]: You're the one that brought it up, Mr. Clark.
>
> [CLARK]: No, you brought it in. You['re] the one [who] inquired of me about this. I didn't inquire of you about it. The tape I was talking about - - we [were] discussing the tape about the interview between [Investigator Sheley], [Investigator Davis], and myself. I never said one word, and neither did I open the door, about anybody else or any other tape concerning this matter. You've done that, not Patrick Clark. You opened the door for that, not Patrick Clark.
>
> [STATE]: Well, we're just going to have to agree to disagree.

Clark now argues that the trial court erred in allowing the State to question him regarding his

interview with the late Sheriff Bryan, because the court had previously excluded the interview on the basis that Clark would be unable to confront Sheriff Bryan at trial. In response, the State argues that during direct examination, Clark "opened the door" to discuss the interview with Sheriff Bryan; thus, it was proper for the State to question Clark on cross-examination.

¶17. "The standard of review for admission of evidence is abuse of discretion." *Debrow v. State*, 972 So. 2d 550, 552 (¶6) (Miss. 2007) (citations omitted). "The relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused." *Weaver v. State*, 713 So. 2d 860, 865 (¶31) (Miss. 1997) (citations omitted). "Evidence, even if otherwise inadmissible, can be properly presented where the defendant has 'opened the door.'" *Washington v. State*, 726 So. 2d 209, 216 (¶34) (Miss. Ct. App. 1998) (internal citations omitted). When faced with an error in an evidentiary ruling, appellate courts "must review the record de novo to determine whether reversal is warranted." *Williams v. State*, 991 So. 2d 593, 599 (¶20) (Miss. 2008). "Mere errors in evidentiary rulings by the trial court, unless accompanied by some adverse effect on a 'substantial right' of the defendant, do not require reversal on appeal." *Bounds v. State*, 852 So. 2d 51, 55 (¶11) (Miss. Ct. App. 2002). "It is the duty of the appellant, not only to demonstrate error in the introduction of the evidence, but also to show the prejudice to the defense that arose from that erroneous ruling." *Id*.

¶18. After reviewing the trial transcript at length, we find that Clark did not open the door

16

regarding the taped interview with Sheriff Bryan; thus, the trial court erred in allowing the State to question Clark as to that interview. As previously mentioned, Investigator Sheley testified as to his and Investigator Davis's taped interview with Clark, where Clark allegedly said he "forced his way into the residence." Shortly thereafter, Clark testified on direct examination that he never made those remarks to Investigators Sheley and Davis, and to "let the jury listen to the tape." On cross-examination, the State asked Clark how the door to Wren's trailer "got kicked in"; Clark again replied, "let the jury listen to the tape." It is clear to this Court that Clark was referencing the tape of his interview with Investigators Sheley and Davis. During Clark's direct examination and cross-examination, the only mention made of the interview with Sheriff Bryan was when the State twice remarked that Clark made two separate interviews: one with Investigators Sheley and Davis and one with Sheriff Bryan. Clark never referenced his interview with Sheriff Bryan or its contents, and the context of the trial transcript makes it clear that Clark sought to "let the jury listen to the tape" of his interview with Investigators Sheley and Davis, not the interview with Sheriff Bryan.

¶19. However, the trial court's error in allowing the State to question Clark regarding his interview with Sheriff Bryan was harmless. During its questioning, the State remarked that Clark had told Sheriff Bryan that he brought a gun into Wren's trailer. Clark stated that he did not recall making that assertion. Further, Clark testified that he did not bring a gun into Wren's trailer; rather, he argued that he entered the trailer empty-handed and, once inside, grabbed a gun that he regularly kept behind the TV stand by the door. The jury heard both

17

Clark's testimony and the testimony of Tony, Wren's son, who maintained that he witnessed Clark enter Wren's trailer with a twelve-gauge shotgun in his hand. The jury also heard testimony by Investigator Sheley, who said that Clark told Investigators Sheley and Davis that he was in possession of a shotgun at the time that he forced his way into Wren's trailer. The jury ultimately believed the testimony of Tony and Investigator Sheley over that of Clark, finding that Clark entered Wren's trailer with a gun in his hand. Based on the testimonies of Investigator Sheley and Tony, it is abundantly clear that the trial court's error, in allowing the interrogation of Clark concerning his interview with Sheriff Bryan, was harmless, and does not warrant reversal.

> 2. *Whether Clark's trial counsel was constitutionally ineffective*

¶20. Typically, ineffective-assistance-of-counsel claims are more appropriately brought in the form of a PCR motion rather than on direct appeal, because appellate courts reviewing a direct appeal are confined to the trial-court record, which may lead to situations where there is insufficient evidence to adequately address the claim. *Reed v. State*, 204 So. 3d 785, 789 (¶15) (Miss. Ct. App. 2016). In such situations, "the proper procedure is to decline to address it so as to preserve the defendant's right to argue it through a petition for PCR. However, the claim may be addressed on direct appeal if it is based on facts fully apparent from the record." *Id.* (citing M.R.A.P. 22). Here, the parties do not stipulate that the record is adequate for the appellate court to make a finding on direct appeal. However, as Clark's claim is contingent upon specific instances at trial—the transcript of which is included in the

18

record—we find that the facts are fully apparent from the record and Clark's claim may be addressed.

¶21. "In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that his attorney's performance was deficient and that the deficiency was so substantial as to deprive the defendant of a fair trial." *Dartez v. State,* 177 So. 3d 420, 423 (¶19) (Miss. 2015) (citing *Holly v. State*, 716 So. 2d 979, 989 (Miss. 1998) (applying the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984))). Appellate courts consider the totality of the circumstances in determining whether counsel's representation was both deficient and prejudicial. *Id*. "There is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Only where it is reasonably probable that, but for the attorney's errors, the outcome would have been different, will [the court] find that counsel's performance was deficient." *Id*.

¶22. Here, Clark maintains that his counsel was ineffective by (1) "failing to object to unrelated other alleged bad-act evidence offered by the [S]tate and by failing to request a limiting instruction on such evidence," with respect to the State's introduction of evidence that Clark stole guns from his mother's home prior to Wren's death; (2) "failing to seek an instruction on self-defense"; and (3) "failing to make a proffer of Clark's prospective testimony after the trial court refused to allow Clark to be recalled as a witness." In response, the State first argues that even if Clark's counsel had objected to introduction of the bad-act evidence at issue, the trial court would have declined to exclude it because it involved

19

information necessary to "[t]ell the complete story so as not to confuse the jury." *Palmer v. State*, 939 So. 2d 792, 795 (¶9) (Miss. 2006). Second, the State maintains that the evidence did not support the need for a self-defense instruction because no self-defense instruction is required for felony murder pursuant to the Mississippi Supreme Court's decision in *Layne v. State,* 542 So. 2d 237, 243 (Miss. 1989), in which the court rejected the defendant's assertion that self-defense was an appropriate defense to a felony-murder charge where there was "no reasonable basis upon which the jury may rationally have concluded that [the defendant] had not participated actively" in the underlying felony giving rise to his felony-murder charge. Additionally, the State relies on *Taylor v. State*, 597 So. 2d 192, 194 (Miss. 1992)—in which the supreme court held that a self-defense instruction was improper where the defendant alleged accident or excusable homicide throughout his trial—to argue that Clark similarly alleged that he shot Wren by accident. Third, the State argues that there was no evidence that had Clark been recalled as a witness, he would have given testimony either supporting his theory of the case or refuting the State's theory.

¶23.    We agree with the State on all three points. First, as Wren's death was caused by a fatal shot from a twelve-gauge shotgun, the evidence that Clark took guns from his mother's home was relevant to show that Clark was in possession of a twelve-gauge shotgun and to corroborate Tony's testimony that Clark entered Wren's trailer holding the shotgun. Second, Clark was not entitled to a self-defense instruction because he was engaged in the commission of a felony—burglary of a dwelling with the intent to commit the crime of

assault therein—when he shot Wren. Even if the jury had not found that Clark was committing burglary when he shot Wren, a self-defense instruction would have been improper pursuant to *Taylor* because Clark alleged throughout trial that his shooting of Wren was accidental. Clark cannot suddenly maintain that he was deprived of a self-defense instruction when he never asserted that he shot Wren in self-defense.

¶24. For the sake of efficiency, we will discuss the third point—whether Clark's counsel was ineffective for failing to make a proffer as to why Clark should be recalled as a witness—later in this opinion. However, Clark's argument here is also without merit.

¶25. The ultimate question as to adequacy of counsel is whether "it is reasonably probable that, but for the attorney's errors, the outcome would have been different." *Dartez*, 177 So. 3d at 423 (¶19). Here, we cannot say that Clark would have been found not guilty had his counsel acted in accordance with any of Clark's three claims above. Thus, we find this issue without merit.

### 3. Whether the trial court erred in refusing to allow Clark to be recalled as a witness

¶26. It is within the sound discretion of the trial court to permit a witness to be recalled to the stand once the witness has completed his testimony. *Ellis v. State*, 799 So. 2d 159, 161 (¶7) (Miss. Ct. App. 2001). Rule 611(a) of the Mississippi Rules of Evidence provides that the trial court, in making its determination as to whether it should allow a witness to be recalled, "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for

21

determining truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." Therefore, we will not disturb a trial court's ruling in this regard unless the trial court abused its discretion.

¶27. Six witnesses testified during Clark's case-in-chief. Clark was the third witness of those six to testify, during which he was questioned on direct examination, cross-examination, and redirect examination. After the sixth and final defense witness testified, Clark's counsel—at Clark's insistence—requested that Clark be allowed to retake the witness stand. Clark made no proffer, and the judge denied Clark's request. Later, during his motion for a JNOV or, in the alternative, a new trial, Clark argued that he should have been allowed to retake the witness stand because "he would have been testifying basically in rebuttal as to what some of the other witnesses had said[,] . . . making sure the jury heard his complete side of the story." The trial judge denied Clark's motion, explaining that he denied Clark's request on the basis of Rule 611, and that he "wasn't going to let Mr. Clark testify two or three, four times just because he wanted to." We find this decision to have been fully within the trial judge's discretion, as Clark offered no evidence that testifying a second time would have provided any additional, helpful information to the jury. This issue is without merit.

### B. Issues Raised by Clark, Pro Se

#### 1. Whether the trial court erred in requiring Clark to wear an electronic restraint at trial

¶28. In *Jones v. State*, 130 So. 3d 519, 525-26 (¶21) (Miss. Ct. App. 2013), we reiterated that a defendant has a right "to be free from all manner of shackles or bonds . . . when in

22

court in the presence of the jury, unless in exceptional cases where there is evident danger of his escape or in order to protect others from an attack by the prisoner." (Quoting *Jones v. State*, 20 So. 3d 57, 60 (¶10) (Miss. Ct. App. 2009)). However, a trial judge has "considerable discretion regarding the decision to restrain a defendant," "based upon reasonable grounds for apprehension." *Id*. at 525-26 (¶21). A defendant whose rights have been violated may only have his conviction overturned if there is a showing that he suffered prejudice. *Id*. at 526 (¶21).

¶29. Clark argues that his right to a fair trial was denied and that he was prejudiced by the Court's decision to require him to wear an electronic restraint (i.e., a "stun pack") during courtroom appearances. The State, in response, argues that the stun pack has previously been used "in certain cases when the courtroom security and the sheriff actually notify the Court that they have a concern," and that such a concern was clearly present in this case, as courtroom security and the sheriff recommended that Clark wear the restraint. Further, the State argues that the stun pack, which is attached to a defendant's upper leg, is not visible to the public when he is wearing pants and that it in no way hinders the ability of the defendant to testify or move about freely. Given these facts, we do not find that the trial judge erred in requiring Clark to wear the electronic restraint.

> 2. *Whether the trial court violated Clark's right to confront the witnesses against him in allowing the coroner's medical-examiner investigator to testify as to the state medical examiner's autopsy report*

¶30. Alleged errors that were not raised at trial are procedurally barred on appeal; however,

a defendant who fails to make a contemporaneous objection may "rely on plain error to raise the assignment on appeal." *Dobbins v. State*, 766 So. 2d 29, 31 (¶¶4-5) (Miss. Ct. App. 2000). With respect to plain error, Mississippi law is settled in that the plain-error rule is only applicable "when a defendant's substantive rights are affected." *Id*. at (¶5) (quoting *Grubb v. State*, 584 So. 2d 786, 789 (Miss. 1991)):

> The plain error doctrine has been construed to include anything that seriously affects the fairness, integrity or public reputation of judicial proceedings. *Id*. (quoting *United States v. Olano*, 507 U.S. 725 (1993)). The plain error doctrine requires that there be an error and that the error must have resulted in a manifest miscarriage of justice. Both error and harm must be found for reversal.

*Id*. (internal citations and quotation marks omitted). An appellate court's "standard of review regarding admission or exclusion of evidence is abuse of discretion." *Jenkins v. State*, 102 So. 3d 1063, 1065 (¶7) (Miss. 2012). However, "[c]onstitutional issues are reviewed de novo." *Id*.

¶31. A defendant has the right to confront witnesses against him, pursuant to the United States and Mississippi Constitutions. *England v. State*, 195 So. 3d 830, 833 (¶11) (Miss. Ct. App. 2016) (reh'g denied June 21, 2016); U.S. CONST. amend VI; MISS. CONST. art. 3, § 26. "The United States Supreme Court has held that the Sixth Amendment Confrontation Clause bars the admission of 'testimonial statements' made by a witness who does not appear at trial, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine him." *Id*. (citing *Jenkins*, 102 So. 3d at 1066 (¶9)). "Forensic laboratory reports created specifically to serve as evidence against the accused at trial are among the 'core class of

24

testimonial statements' governed by the Confrontation Clause." *Id*. (citing *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009)). However, the Mississippi Supreme Court has held that, "[b]y contrast, when the testifying witness is a court-accepted expert in the relevant field who participated in the analysis in some capacity, such as by performing procedural checks, then the testifying witness's testimony does not violate a defendant's Sixth Amendment rights." *Id*. at (¶12) (quoting *McGowen v. State*, 859 So. 2d 320, 339 (¶68) (Miss. 2003)). Appellate courts are to apply a two-part test when determining whether a witness satisfies the defendant's right to confrontation:

> First, we ask whether the witness has "intimate knowledge" of the particular report, even if the witness was not the primary analyst or did not perform the analysis firsthand. Second, we ask whether the witness was "actively involved in the production" of the report at issue. We require a witness to be knowledgeable about both the underlying analysis and the report itself to satisfy the protections of the Confrontation Clause.

*England*, 195 So. 3d at 833-34 (¶12) (quoting *Jenkins*, 102 So. 3d at 1067 (¶13)).

¶32. Clark argues that he was denied his constitutional right to confront and cross-examine a witness testifying against him because the coroner's medical-examiner investigator, Donna Stevens, was allowed to testify in place of the state medical examiner, Dr. Steven Hayne, as to the autopsy performed by Dr. Hayne. The autopsy to which Stevens testified at trial was conducted and authored by Dr. Hayne; however, Stevens both personally identified Wren's body at the crime scene and authorized and observed Dr. Hayne's autopsy of the body. She had intimate knowledge of the report offered at trial because she personally observed it taking place, in addition to the fact that she personally identified the body at the crime scene.

¶33. Further, the Mississippi Supreme Court found in *Gossett v. State*, 660 So. 2d 1285, 1296 (Miss. 1995), that even where the trial court erred in admitting an autopsy report when the person who conducted the autopsy and authored the report failed to testify, the error was harmless because the evidence was still sufficient to convict the defendant beyond a reasonable doubt. Thus, even if this Court were to find that Stevens did not have intimate knowledge sufficient to allow her to testify as to the final autopsy report, the admission of the report constitutes harmless error, as there is ample evidence to show that Wren's cause of death was a shotgun blast to her chest.

> 3. *Whether Clark's right against double jeopardy was violated in allowing him to be convicted and sentenced a second time and in allowing the State to prove that he was a habitual offender for a second time*

¶34. The court will apply a de novo standard when reviewing claims of double jeopardy. *Kelly v. State*, 80 So. 3d 802, 804 (¶8) (Miss. 2012). First, Clark argues that his right against being subjected to double jeopardy was violated when he was tried, convicted, and sentenced a second time for Wren's murder. Mississippi Code Annotated section 99-11-29 (Rev. 2015) provides:

> Where a defendant is acquitted of a criminal charge upon trial on the ground of a variance between the indictment and proof, *or upon exception to the form or substance of the indictment or record*, he may be tried and convicted upon a subsequent indictment for the offense actually committed, notwithstanding such acquittal . . . .

(Emphasis added). Further, the Mississippi Supreme Court held in *Estes v. State*, 502 So. 2d 1184, 1185 (Miss. 1987), that the Double Jeopardy Clause did not preclude a defendant's

26

second trial after his first prosecution was dismissed due to insufficiency of the indictment. Thus, the fact that Clark's 1998 indictment was set aside as insufficient does not preclude his second indictment and conviction. This argument is without merit.

¶35. Second, Clark argues that his right against being subjected to double jeopardy was violated when the State was given a second opportunity to prove that he was a habitual offender. As previously stated, a person may be tried and convicted upon a subsequent indictment notwithstanding the fact that a previous indictment was set aside as a result of a defect in the form or substance of the indictment. While Clark's 1998 indictment was set aside, it was not because the indictment erroneously alleged that he was a habitual offender. Clark was at the time of both his 1998 and 2012 indictments a habitual offender. Clark's 1998 capital-murder indictment was set aside because that indictment failed to allege the crime constituting the burglary, which was the predicate crime for the capital-murder charge. Thus, we find no merit to this issue.

4.    *Whether the State failed to prove that Clark was a habitual offender*

¶36. Clark argues that the State failed to prove that he served two separate terms of one year or more, as required under Mississippi Code Annotated section 99-19-83 (Rev. 2015). Clark maintains that his sentences for two prior convictions were served concurrently and therefore do not constitute two separate terms. Section 99-19-83 specifically states:

> Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and *who shall*

27

*have been sentenced to and served separate terms of one (1) year or more, whether served concurrently or not*, in any state and/or federal penal institution, whether in this state or elsewhere, and where any one (1) of such felonies shall have been a crime of violence, as defined by Section 97-3-2, shall be sentenced to life imprisonment, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole, probation or any other form of early release from actual physical custody within the Department of Corrections.

(Emphasis added). At trial, the State presented the supervisor of the records office at the Mississippi State Penitentiary, who testified that Clark served at least one year for each of his convictions for sexual battery and strong-arm robbery. Clark entered MDOC custody on June 29, 1992, and was released on July 2, 1996; he served a total of four years and three days within the custody of MDOC. His two sentences ran concurrently with each other, which is expressly allowed under section 99-19-83. Clark's argument is moot, and we find this issue without merit.

5. *Whether Clark was denied his right to confidential communications with his attorney*

¶37. Clark argues that he was "deprived of his right to a fair trial when his entire defense file was taken and wrongfully given to the [S]tate prosecutor." Clark filed a pro se "Petition of Notice" on October 22, 2014, alleging that when his former counsel withdrew from his case, the former counsel left Clark's confidential defense file on the table in the courtroom; Clark maintained that the prosecution then retrieved the file and reviewed its contents. The trial court held a hearing on this matter, at which Major Barry Thompson testified regarding the event when Clark alleges his defense file was compromised:

[Clark] was either placed back in the cell or one of the other courtroom deputies took him out of the courtroom. . . . [A]t that point [Clark] had relieved [his counsel] from the case. [Clark's former counsel] handed me what I believed to be [Clark's] file with his discovery in it and told me to get it to [Clark]. . . . [A]t that point [Clark was] appointed [new counsel] to the case, and I was told to take that file to [the court administrator's] office where it would be turned over to [Clark's new counsel]. I never looked inside the file, it was given to [the court administrator,] and she took it to her office where it was turned over to [Clark's new counsel].

Clark maintained at the hearing that he observed Major Thompson hand the file to the State prosecutor. Major Thompson denies that this occurred. Both the assistant district attorney and the State's investigator testified that they never touched Clark's file. The trial court ultimately denied Clark's petition, finding that there was insufficient evidence to conclude that Clark's rights had been violated, and we agree. Further, Clark has offered no evidence that he was prejudiced by this alleged incident.

¶38. Clark also maintains in his pro se brief that he was denied due process because the trial judge, while off the record, refused to allow him to obtain witnesses in his favor—specifically, his former counsel who allegedly left the file on the table—at the hearing. Suffice it to say that even if Clark had been allowed to call his former attorney and that attorney had corroborated Clark's contention that the attorney placed the file on the table, Clark still has offered no evidence to rebut the State's evidence that the State did not access his file. We find this issue without merit.

> 6. *Whether the trial court erred in allowing questioning as to Clark's "Letter Confession"*

¶39. As previously stated, the failure of a defendant to make a contemporaneous objection

to an alleged error at trial procedurally bars appellate courts from hearing that issue on appeal, unless the error falls under the plain-error doctrine. *Dobbins*, 766 So. 2d at 31 (¶¶4-5) (citations omitted). "The plain-error doctrine requires that there be an error and that the error must have resulted in a manifest miscarriage of justice." *Id*. "Both error and harm must be found for reversal." *Id*.

¶40. "The standard of review for admission of evidence is abuse of discretion." *Debrow*, 972 So. 2d at 552 (¶6) (citations omitted). "Evidence, which is otherwise inadmissible, may be used for impeachment purposes only." *Weems v. State*, 63 So. 3d 579, 585 (¶15) (Miss. Ct. App. 2010).

¶41. Clark argues that he was prejudiced and deprived of his right to a fair trial when the trial court allowed testimony regarding a "Letter Confession," which had been precluded by plea negotiations and was therefore inadmissible. However, Clark failed to object to the introduction of this evidence at trial. Thus, the issue is now barred on appeal unless Clark is able to show that there was an error and that the error resulted in a manifest miscarriage of justice.

¶42. The "Letter Confession" at issue is a letter, submitted to the prosecution by Clark, in which he appeared to take full responsibility for causing Wren's death. The prosecution used the letter as a prior inconsistent statement to impeach Clark, in light of the various inconsistencies in Clark's testimony. The State instructed Clark to read the following portion of his "Letter Confession" at trial: "I'm not making any excuses for my action [sic] as to the

shooting death of my girlfriend, Charlene Wren, 16 years ago. I take full responsibility for my actions regardless of the facts and circumstances of this case." This portion of the "Letter Confession" was the only portion read into evidence at trial. Clark asserted throughout his testimony at trial that he "may very well have fired the shot that caused [Wren's] death," but that he was unaware if he actually did so. It is somewhat ambiguous whether this portion of the letter can be considered impeachment, as Clark never directly maintained that he did not shoot Wren; rather, he asserted consistently that he *may* have shot her. Thus, we cannot find that the State's reference to the letter was necessarily proper as impeachment evidence.

¶43. However, we find that, even if the reference to the letter was improper, such an error would be harmless. Clark essentially asserted in his letter the same thing he maintained throughout the entire trial: that he could possibly have been responsible for Wren's death. Thus, we find that admission of this evidence, even if improper, constitutes harmless error.

> 7. *Whether the trial court erred in denying Clark's motion*
> *to dismiss the indictment*

¶44. The crime of capital murder is defined as "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . burglary." Miss. Code Ann. § 97-3-19(2)(e) (Supp. 2016). The crime of burglary is defined as the "breaking and entering the dwelling house or inner door of such dwelling house of another, whether armed with a deadly weapon or not, and whether there shall be at the time some human being in such dwelling house or not, with intent to commit some crime therein."

Miss. Code Ann. § 97-17-23(1) (Rev. 2015). Here, Clark's 2012 indictment specifies that Clark committed burglary—i.e., he broke and entered Wren's trailer—"with the intent to commit the crime of assault, with or without any design to effect the death of [Wren]." This indictment is sufficient, as it alleges each offense necessary to charge Clark with capital murder in this case: assault, burglary, and, ultimately, murder.

¶45. Clark maintains, however, that the indictment should have been dismissed because the crimes of burglary and capital murder are both predicated on his commission of an assault, which is subject to a two-year statute of limitations for prosecution. The short answer to this argument is that Clark was charged with capital murder. Mississippi Code Annotated section 99-1-5 (Rev. 2015) provides that "[t]he passage of time shall never bar prosecution against any person for the offenses of murder, . . . aggravated assault, . . . [or] burglary." Miss. Code Ann. § 99-1-5. We find this issue is without merit.

> 8. *Whether the trial court erred in allowing witness testimony regarding "immaterial, irrelevant, and highly prejudicial" facts not in evidence*

¶46. This Court granted a motion by Clark to supplement the record with the following transcripts: (1) the July 2, 2014 hearing transcript of his motion to suppress and motion to sever; (2) the October 22, 2014 hearing transcript of the motion to fire his appointed counsel; and (3) the December 13, 2013 hearing transcript of his motion to dismiss the indictment filed by his attorney and motion for change of venue. This Court also granted Clark's motion to file an amended supplemental brief addressing only issues arising out of those

32

proceedings. In his "Amended Supplemental Brief of the Appellant," Clark asserts three issues: (1) whether the trial court erred in failing to grant his motion for change of venue; (2) whether the trial court abused its discretion in denying Clark his right to proceed pro se; and (3) whether he was denied his right to a fair and impartial trial due to the introduction of "immaterial, irrelevant, and highly prejudicial evidence" in the form of testimony by Tony that Wren owned a pistol, which she kept in her bedside drawer, and that Tony had found it broken and unable to be fired after Wren's murder. Clark maintained that Tony's testimony, which took place during trial, was misleading and "in bad faith," and that its introduction, combined with his own counsel's failure to object to it, constitutes plain error. However, since this issue emanates from testimony included in the original record, not in the supplemental record, Clark should have raised it in his supplemental brief, not his amended supplemental brief. Therefore, we decline to address it because he was granted permission to address in his amended supplemental brief only issues emanating from the supplemental record.

9.      *Whether the trial court erred in denying Clark's motion*
        *for change of venue*

¶47.    "We review denials of motions for change of venue for abuse of discretion." *Stewart v. State*, 29 So. 3d 12, 14 (¶6) (Miss. Ct. App. 2008) (citations omitted). The "[g]ranting of a change of venue is a matter so largely in the sound discretion of the trial court that a judgment of conviction will not be reversed on appeal on the ground that a change of venue was refused, unless it clearly appears that the trial court abused its discretion." *Id*. (quoting

33

*Adams v. State*, 944 So. 2d 86, 89 (¶17) (Miss. Ct. App. 2006)). "In reviewing whether the trial court abused its discretion in denying a change of venue 'we look to the completed trial, particularly including the voir dire examination of prospective jurors, to determine whether the accused received a fair trial.'" *Id*. (quoting *Lutes v. State*, 517 So. 2d 541, 546 (Miss. 1987)). "Under Mississippi law, upon a proper application for a change of venue a presumption arises that an impartial jury cannot be obtained." *Id*. (citation omitted). Mississippi Code Annotated section 99-15-35 (Rev. 2015) sets forth the requirements for proper application for change of venue:

> On satisfactory showing, *in writing, sworn to by the prisoner*, made to the court, or to the judge thereof in vacation, supported by the affidavits of two or more credible persons, that, by reason of prejudgment of the case, or grudge or ill will to the defendant in the public mind, he cannot have a fair and impartial trial in the county where the offense is charged to have been committed, the circuit court, or the judge thereof in vacation, may change the venue in any criminal case to a convenient county, upon such terms, as to the costs in the case, as may be proper.

(Emphasis added).

¶48.   At a hearing conducted on October 31, 2013, the trial judge determined that Clark's motion for change of venue was procedurally barred, as it did not conform with the requirements set forth in section 99-15-35; specifically, Clark failed to swear to the petition for change of venue. Procedural bar notwithstanding, the trial judge considered the evidence presented and concluded that Clark was able to have a fair and impartial trial in Panola County; the trial judge noted that even though Clark's guilty plea and sentence had been set aside in 2012, the actual crime occurred in 1998; further, the judge found that there had been

34

little publicity in 2012 regarding the setting aside of Clark's guilty plea and sentence. The judge went on to find that there had been an in-depth voir dire of jurors during jury selection. Thus, the trial judge denied Clark's motion for change of venue.

¶49. Here, Clark never properly applied for a change of venue; therefore, he never successfully raised a presumption that a change of venue was necessary. Notwithstanding this failure, however, we look at Clark's completed trial and find that it was fair. Clark asserts in his brief that the potential jurors were never questioned as to whether they had signed a petition circulated by the victim's family members with respect to Clark's arrest and incarceration, thus constituting prejudice. However, the trial transcript indicates a thorough voir dire examination in which potential jurors were asked whether they knew Clark or his family or whether they had personal knowledge of the case and whether that would influence their impartiality. This line of questioning necessarily excluded those who may have had bias for or against Clark, rendering a question about signing a petition unnecessary. Further, none of the factors set forth by the supreme court in *White v. State*, 495 So. 2d 1346, 1349 (Miss. 1986), are present, which would render the presumption for a change of venue irrebutable.[7] We therefore find that the trial court did not abuse its discretion in denying Clark's motion for change of venue.

---

[7] These factors include: (1) "[c]apital cases based on considerations of a heightened standard of review"—in other words, death-penalty cases; (2) "[c]rowds threatening violence toward the accused"; and (3) "[a]n inordinate amount of media coverage." *White*, 495 So. 2d at 1349; *see also King v. State*, 784 So. 2d 884, 886 (¶5) (Miss. 2001).

### 10. *Whether the trial court denied Clark his right to proceed pro se*

¶50. The defendant in a criminal proceeding has the right to present his case himself, or through counsel, or both. MISS. CONST. art. 3, § 26. "A refusal to allow a defendant to represent himself is a violation of his constitutional rights and requires reversal." *Taylor v. State*, 812 So. 2d 1056, 1059 (¶13) (Miss. Ct. App. 2001). The Mississippi Supreme Court allows for "'hybrid representation' in an effort to strike a balance between the right to counsel and the right to self-representation." *Henley v. State*, 729 So. 2d 232, 236 (¶14) (Miss. 1998). "Hybrid representation encompasses both the participation of the criminal defendant in the course of the trial when he has not effectively waived his right to assistance of counsel, and the participation by an attorney when the defendant is proceeding pro se." *Id*. "[W]hether to allow hybrid representation lies in the discretion of the trial court." *Id*.

¶51. Clark argues that the trial court abused its discretion when it refused to allow Clark to present his own case and forced Clark to instead proceed to trial with appointed defense counsel. The record in this case indicates that the trial judge had multiple conversations with Clark in which he explained that Clark could proceed pro se or with representation by appointed counsel. However, the trial judge emphasized the fact that while Clark could proceed pro se, he was still bound by the procedural requirements of any attorney licensed in the State of Mississippi. The following conversations transpired during a pretrial hearing on January 7, 2015:

> [COURT]: . . . [D]o you wish to proceed pro se today or is [appointed counsel]

36

going to represent you . . . ?

[CLARK]: [Appointed counsel] is going to represent me.

[COURT]: Okay.

[CLARK]: But not on those motions that I filed.

[COURT]: You can't have it both ways, Mr. Clark. He's either representing you or he's not. The last time you were going to represent yourself and I told [appointed counsel] he didn't have to do any work[;] he was there for courtroom procedure and protocol only, because I advised you that you have to be held to the same rules and standards that a practicing attorney licensed by the state of Mississippi does.

[CLARK]: Right, but on the motions that I filed, I filed them pro se, Your Honor.

[COURT]: I understand that, Mr. Clark, and I advised you not to do that. If you're not going to do what I order you to do, then you and I are going to have a problem.

[CLARK]: Judge, the Constitution offers me those rights to do that, Your Honor. I mean I don't understand why I can't proceed pro se when the Constitution allows me the right to do that. Section 26 of the Constitution.

[COURT]: Mr. Clark, I said you could proceed pro se.

* * * *

[COURT]: Mr. Clark, . . . why don't you get with [appointed counsel], since you're going to allow [him] to represent you from this point forward; is that correct?

[CLARK]: Yes.

* * * *

[DEFENSE COUNSEL]: Now, are you going to be proceeding pro se at trial or do you want me to handle the case?

37

[CLARK]: You going to handle it according to the Constitution, me and you both are going to handle that case.

[COURT]: That is correct, Mr. Clark. You understand that [appointed counsel] is your attorney, y'all confer about certain decisions, but ultimately you make the decision and your attorney conveys that decision by you to the Court and to counsel opposite? You understand that?

[CLARK]: I understand.

¶52. At another pretrial hearing on February 11, 2015, the trial court called Clark's appointed defense counsel to address Clark's motion for the trial judge to recuse himself. Clark's appointed defense counsel replied that he did not file the motion; rather, Clark had filed the motion pro se. Thus, Clark's appointed defense counsel thought it would be appropriate to question Clark, himself, about the motion. The trial judge replied, "All right. Why don't you call Mr. Clark up, put him on the stand. I'm not going to let Mr. Clark be his own attorney when I've told him not to."

¶53. Clark maintains in one of his briefs that "[t]he trial court abused its discretion when it denied Clark his constitutional right to be heard by himself, forcing Clark to proceed to trial with appointed defense counsel." However, the facts of the record indicate that this is untrue. As evidenced by the above conversations, the trial court offered Clark ample opportunity to proceed pro se. The trial court questioned Clark several times to ensure that he understood that he could either proceed pro se or with the assistance of an attorney. The trial court offered Clark the form of hybrid representation that has been approved by Mississippi courts in multiple instances. The trial court remarked several times throughout

38

the proceedings that Clark was competent and intelligent. While Clark may have previously exhibited a desire to proceed pro se, the record before us indicates that for this matter, Clark desired to proceed with his appointed defense counsel. Thus, Clark was not deprived of the right to represent himself; rather, he knowingly accepted the appointment of defense counsel through hybrid representation. We therefore find this issue without merit.

¶54.    For the reasons set forth above, we affirm Clark's conviction of and sentence for capital murder.

¶55.    **THE JUDGMENT OF THE CIRCUIT COURT OF PANOLA COUNTY, FIRST JUDICIAL DISTRICT, OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PANOLA COUNTY.**

    **LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**